### JOHN DOE *v.* CONNECTICUT BAR EXAMINING COMMITTEE
### (SC 16637)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued March 12, 2002—officially released April 1, 2003

*James F. Stapleton*, with whom was *Paulette Wunsch*, for the appellant-appellee (defendant).

*William F. Gallagher*, for the appellee-appellant (plaintiff).

*Opinion*

BORDEN, J. The defendant, the Connecticut bar examining committee, appeals and the plaintiff, John

Doe, cross appeals[1] from the judgment of the trial court reversing the defendant's decision not to recommend him for admission to the bar of Connecticut and remanding the case for a new hearing before a new panel of the defendant. The defendant claims that the trial court: (1) utilized an improper standard of review when evaluating the defendant's decision; and (2) improperly granted the plaintiff's motion to proceed anonymously in these proceedings. In his cross appeal, the plaintiff claims that the trial court improperly remanded the issue to the defendant, and, instead, should have ordered the plaintiff's admittance to the bar. We agree with the defendant that the trial court used an improper standard of review, and, accordingly, we reverse the judgment of the trial court.[2]

The defendant issued a decision recommending that the plaintiff not be admitted to the bar. The plaintiff then filed this petition requesting the trial court to admit him to the bar. The trial court rendered judgment reversing the decision of the defendant, and remanded the plaintiff's petition to the defendant for a new hearing before a different panel of the defendant. This appeal and cross appeal followed.

The record reveals the following facts and procedural history. The plaintiff entered Quinnipiac College School of Law (Quinnipiac) in January, 1991. In May, 1994, while a third year law student, the plaintiff reached an agreement with the Quinnipiac student discipline committee, which found that he had "violated Student

---

[1] The defendant appealed and the plaintiff cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Because we conclude that the trial court applied an improper standard of review and therefore direct a judgment for the defendant, ordering the trial court to adopt the defendant's recommendation, we need not address the plaintiff's cross appeal.

Conduct Code Section 3 B by submitting . . . the work of another as his own for academic credit in satisfaction of the substantial paper writing requirement." The plaintiff, among other sanctions, was suspended from school through the 1995 summer session.

Following graduation from Quinnipiac, the plaintiff filed an application to take the Connecticut bar examination and for admission to the bar. The plaintiff disclosed his act of plagiarism on the application for admission, as well as a history of financial credit problems. Thereafter, the statewide grievance committee (grievance committee) conducted an investigation of the plaintiff concerning an anonymous allegation that he was involved in the unauthorized practice of law. That allegation stemmed from the plaintiff's work as a law clerk for the law firm Basilica & Stewart. Also working at the law firm was Tammy Gervais, a legal secretary, whose duties included depositing and writing checks. Both Gervais and the plaintiff admitted that there was a degree of animosity between them. Although the plaintiff believed that Gervais had made that allegation, she denied any involvement. The grievance committee found no misconduct on the part of the plaintiff. Thereafter, the plaintiff amended his application in order to notify the defendant of this investigation.

As a result of the plaintiff's disclosures, the defendant forwarded the plaintiff's application to the New London standing committee on recommendations for admission to the bar (standing committee) for review. After conducting a hearing concerning the issues of plagiarism, the plaintiff's credit problems, and the unauthorized practice of law, the standing committee recommended the plaintiff for admission to the bar. This recommendation was forwarded to the defendant.

The defendant then conducted its own proceeding, taking six days of testimony over a period of thirteen

months. The first hearing, occurring on November 14, 1997, concerned the three issues previously addressed by the standing committee, as well as the issue of the plaintiff's "candor and credibility." As the hearing progressed, the defendant became concerned over apparent inconsistencies between the testimony of the plaintiff and certain other witnesses called by the defendant. In light of the concerns raised by the testimony, the defendant issued an amended notice of hearing, notifying the plaintiff that it had expanded its hearing from the four issues that it originally was considering, so as to include whether the plaintiff had: (1) "[engaged] in conversations with a [c]ertified [p]ublic [a]ccountant concerning confidential financial, personal and/or personnel matters of the [plaintiff's] former employer"; and (2) "[acted] in such a manner as to slander, defame or tarnish the character of a former coemployee, in a manner which could adversely affect both her reputation and income, and denying such activities to their former common employer." After five hearing dates, the defendant circulated a draft memorandum of decision recommending that the plaintiff be denied admission to the bar. The plaintiff, after being given the opportunity by the defendant, presented additional evidence concerning the factual findings of the memorandum. Thereafter, the defendant issued its final memorandum of decision, in which it concluded that the plaintiff "lacks present good moral character and . . . is not recommended for admission to the [bar]."

In reaching its decision, the defendant focused on two particular areas: "(1) allegations of plagiarism with respect to a major project submitted by the [plaintiff] when he was a student at [Quinnipiac], and (2) honesty in dealing with a member of the [b]ar, the [plaintiff's] former employer, concerning a personnel matter." Regarding the plagiarism incident, the defendant found that the plaintiff's testimony concerning the incident

"was in some regards ambiguous and equivocal," and "lacked candor and clarity on the subject of who authored the non-plagiarized portions of the research paper." On the issue of honesty in dealing with a member of the bar, the defendant found that the plaintiff had made a statement to his former employer that "constituted a falsehood to a member of the [b]ar, by an individual seeking membership to the [b]ar, concerning a matter which involved sensitive dealings with other members of the legal profession." The defendant concluded that these two incidents, when taken together, along with the contradictory testimony they engendered, impaired the plaintiff's candor and credibility to such an extent that the defendant could not recommend him for admission to the bar.

The plaintiff then filed this petition in the Superior Court for admission to the bar, claiming that the defendant's decision was arbitrary, unreasonable, an abuse of its discretion or without a fair investigation of the facts, and in connection therewith he applied to the trial court for permission to proceed anonymously with respect to the review of the defendant's decision. The trial court, *Handy, J.*, initially granted the plaintiff's ex parte request to proceed as John Doe. After granting the defendant's motion for reconsideration of the ex parte order, the trial court reaffirmed its earlier decision. After a hearing on the merits, the trial court, *Hon. D. Michael Hurley*, judge trial referee, reversed the decision of the defendant and remanded the case to the defendant for it to constitute a new panel, and to conduct a new hearing to determine the plaintiff's present fitness to practice law. Additional facts will be set forth as necessary.

## I

Before reaching the merits of the defendant's appeal, we address the plaintiff's claim that this court lacks

subject matter jurisdiction to hear this appeal because the trial court's order reversing the decision of the defendant and remanding it for a new hearing before a new panel of the defendant was not a final judgment for purposes of appeal. We disagree.

In examining the question of whether this appeal is from a final judgment, we begin with the premise that, "except insofar as the constitution bestows upon this court jurisdiction to hear certain cases; see *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, [173] 610 A.2d 153 (1992); the subject matter jurisdiction of the Appellate Court and of this court is governed by statute. *Grieco* v. *Zoning Commission*, 226 Conn. 230, 231, 627 A.2d 432 (1993). It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review; see, e.g., General Statutes § 52-278*l* (prejudgment remedies); General Statutes § 54-63g (petition for review of bail); General Statutes § 51-164x (court closure orders); *State* v. *Ayala*, 222 Conn. 331, 340, 610 A.2d 1162 (1992); appellate jurisdiction is limited to final judgments of the trial court. General Statutes § 52-263[3] . . . ." (Internal quotation marks omitted.) *Conetta* v. *Stamford*, 246 Conn. 281, 290, 715 A.2d 756 (1998).

Although the trial court's remand order was interlocutory in nature, "[w]e previously have determined that certain interlocutory orders have the attributes of a

---

[3] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

final judgment and consequently are appealable under § 52-263. In *State* v. *Curcio*, [191 Conn. 27, 31, 463 A.2d 566 (1983)], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 46, 730 A.2d 51 (1999).[4]

"A judgment by a trial court ordering further administrative proceedings cannot meet the first prong of the *Curcio* test, because, whatever its merits, the trial court's order has not terminate[d] a separate and distinct proceeding. The more difficult question is whether the trial court's order so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *Schieffelin & Co.* v. *Dept. of Liquor Control*, 202 Conn. 405, 409–10, 521 A.2d 566 (1987).

Two types of remand orders have been examined under this second prong. In one scenario, "[a] trial court may conclude that an administrative ruling was in error and order further administrative proceedings on that very issue. In such circumstances, we have held the judicial order to be a final judgment, in order to avoid the possibility that further administrative proceedings would simply reinstate the administrative ruling, and thus would require a wasteful second administrative

---

[4] We have held that, "[a]lthough the [defendant] is not an administrative agency . . . the Superior Court's review of its conclusions is similar to the review afforded to an administrative agency decision." (Citations omitted.) *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 821, 601 A.2d 1021 (1992). Because the *Curcio* test applies "to appellate proceedings that arise out of administrative appeals"; *Schieffelin & Co.* v. *Dept. of Liquor Control*, 202 Conn. 405, 409, 521 A.2d 566 (1987); we conclude that, for purposes of final judgment analysis, a remand to the defendant should be viewed in the same light as a remand to an administrative agency.

appeal to the Superior Court on that very issue. See, e.g., *Watson* v. *Howard*, 138 Conn. 464, 468, 86 A.2d 67 (1952); *Santos* v. *Publix Theatres Corporation*, 108 Conn. 159, 161, 142 A. 745 (1928)." (Internal quotation marks omitted.) *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 537–38, 782 A.2d 670 (2001). Alternatively, "[a] trial court may . . . conclude that an administrative ruling is in some fashion incomplete and therefore not ripe for final judicial adjudication. Without dictating the outcome of the further administrative proceedings, the court may insist on further administrative evidentiary findings as a precondition to final judicial resolution of all the issues between the parties. . . . Such an order is not a final judgment." (Citation omitted; internal quotation marks omitted.) Id., 538; see, e.g., *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 202 Conn. 405.

As an example of when a remand order would fit within the first scenario, in *Watson* v. *Howard*, supra, 138 Conn. 466, the zoning board of appeals of Norwalk held a public hearing on whether to grant an application for the operation of a gas station. At the time of the hearing, there was a vacancy on the board, and the four members who voted on the application were deadlocked at two. Id. The board, therefore, decided to postpone further action on the application until a later time. Two days after a fifth member was appointed to the board, the board reconvened and voted three to two in favor of the application. Id. The plaintiff, who opposed the application, appealed from the board's decision to the Court of Common Pleas. Id., 467. The trial court found that the board had acted illegally on the grounds that the fifth member of the board had not examined all the evidence that the other four members had viewed. Id., 468. The trial court remanded the application "to the board with direction to hold another full

public hearing and to make a new finding . . . ." Id., 467.

On appeal, this court concluded that the trial court's order was a final judgment for purposes of appeal. Id., 468. We stated: "The test of finality is whether the rights of the parties are concluded so that further proceedings cannot affect them. . . . The judgment in question met that test. The rights of the parties, in so far as they were capable of being affected by any subsequent proceedings connected with the matter then in court, were forever concluded. Nothing further remained to be decided by the court. The appeal was terminated. The issues which it presented were all resolved. If a new hearing should be held and if the board should again reach a conclusion adverse to the plaintiff, he would be required to institute a new appeal to the Court of Common Pleas. It follows from what we have said that the judgment was a final one from which an appeal to this court lies." (Citations omitted.) Id., 467–68.

In contrast to *Watson*, however, in *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 202 Conn. 406, we concluded that there was no final judgment. In *Schieffelin & Co.*, the plaintiff sought permission from the defendant department of liquor control (department) to terminate several distributorships. The department, in ruling against the plaintiff on a procedural basis, failed to make a finding of whether the plaintiff had established just and sufficient cause for the terminations. Id., 406–407. The plaintiff appealed to the Superior Court, which remanded the case to the department so it could make a finding of whether there was just cause. Id., 408. We concluded that, "[b]ecause there [had] not yet been a definitive administrative determination of the plaintiff's claimed right to terminate the distributorships of the individual defendants, the trial court's interlocutory ruling was not a final judgment." Id., 411–12. Rather, "[t]he present appeal closely resemble[d] the

category of cases in which, because the administrative record is incomplete, appellate review of a judicial order of administrative remand is premature." Id., 410.

In the present case, unlike in *Schieffelin & Co.*, the administrative record was complete. The remand order did not call for "an evidentiary inquiry into an issue that [the defendant] had not previously addressed"; id., 411; but "direct[ed] the [defendant] to undertake an administrative reconsideration of [an issue] upon which the [defendant] had previously ruled"; id.; as did the trial court in *Watson*. We conclude, therefore, that the trial court's remand order to the defendant was a final judgment for purposes of this appeal.[5]

[5] The plaintiff relies on *Conetta* v. *Stamford*, 246 Conn. 281, 291, 715 A.2d 756 (1998), for the proposition that, because the trial court's remand order required the defendant to perform more than ministerial duties, the remand order was not a final judgment. The plaintiff misapplies our language in *Conetta*. In *Conetta*, we held: "*In workers' compensation cases*, [t]he test that determines whether such a decision is a final judgment turns on the scope of the proceedings on remand: if such further proceedings are merely ministerial, the decision is an appealable final judgment, but if further proceedings will require the exercise of independent judgment or discretion and the taking of additional evidence, the appeal is premature and must be dismissed. . . . *This rule is an application of the more general final judgment principle* that an otherwise interlocutory order is appealable where (1) it terminates a separate and distinct proceeding, or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Citation omitted; emphasis added; internal quotation marks omitted.) Id.; see also *State* v. *State Employees' Review Board*, 231 Conn. 391, 410, 650 A.2d 158 (1994) (finality of decision from workers' compensation review board not governed by Uniform Administrative Procedure Act). We recognize that the final judgment analysis we apply to workers' compensation appeals differs from that which we apply to other administrative appeals. We also recognize that there may well be a doctrinal inconsistency between *Conetta* and *Schieffelin & Co.*, in that, under the rationale of *Schieffelin & Co.*, a remand for a whole new administrative proceeding *is* a final judgment, whereas under *Conetta*, an order for a whole new hearing before a workers' compensation commissioner *is not* a final judgment. That, however, is an apparent inconsistency that would not be appropriately resolved in the present case, which does not involve a workers' compensation proceeding and in which we have not had the benefit of the views of the workers' compensation bar. We will await such a case, therefore, in which to address that inconsistency. Because

## II

We now turn to the merits of the defendant's claim, namely, that the trial court did not follow the proper standard of review when considering the defendant's recommendation not to admit the plaintiff to the bar. Specifically, the defendant contends that the trial court did not review the record according to the standard enunciated in *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 822–23, 601 A.2d 1021 (1992), but instead conducted a de novo review of the facts. We agree.[6]

When reviewing the legal conclusions of the trial court concerning the adequacy of evidence before the defendant, we need only determine whether the defendant's finding, that the plaintiff lacked good moral character, is supported in the record of the application proceedings. Id. "[T]he issue before the court is whether the committee or the bar, in withholding its approval for admission, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts." *In re Application of Warren*, 149 Conn. 266, 273, 178 A.2d 528 (1962). "Because the trial court exercises no discretion, but rather is confined to a review of the record before the [defendant], we are not limited to the deferential standard of 'manifest abuse' or 'injustice' when reviewing its legal conclusions about the adequacy of the evidence before the [defendant]." *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 823.

this is not a workers' compensation case, we decline to apply the workers' compensation analysis here.

[6] We note that, before this appeal was argued, pursuant to the trial court's order, the defendant constituted a new panel to consider the plaintiff's application. On March 12, 2002, this new panel issued its decision not to recommend the plaintiff for admission to the bar on the ground that he lacks present good moral character. This decision by the second panel does not moot either party's appeal, because a conclusion by this court that the trial court should have rendered a judgment for either party would make the trial court's remand order improper, thereby voiding the second panel's recommendation.

The defendant based its determination that the plaintiff lacked good moral character on: (1) the 1994 plagiarism incident; (2) the plaintiff's "dishonest and deceitful remarks" to a member of the bar; and (3) the plaintiff's "contradictory testimony" at the hearings. The defendant concluded that "the dishonesty and lack of integrity reflected in the plagiarism of 1994 again surfaced as a character issue for [the plaintiff] in 1998, as illustrated by his dishonest and deceitful remarks to [an attorney at Basilica & Stewart]. Although either of the two episodes, taken alone, might not form a basis for [the plaintiff's] disqualification for want of good moral character, the combination of evidence on these two matters, as well as the [plaintiff's] contradictory testimony before this panel, suggest otherwise. The common theme or pattern is that [the plaintiff] has a continuing tendency to misrepresent himself, in one case as the author of a major law school project which in fact had been substantially written by another and incorporated plagiarized materials, and in the other case in his recent conversations with a member of the bar who was also a witness before this committee on the instant application. The panel also concludes that the [plaintiff's] testimony at the hearing of November 14, 1997 . . . was in a number of matters inconsistent or contradictory, to the extent that the [plaintiff's] candor and credibility were seriously impaired." The defendant, commenting on the plagiarism incident, also "considered relevant . . . that this admitted and dishonest behavior was not in the context of a youthful indiscretion, but rather was the act of a twenty-eight year old adult in seeking the specific professional degree which is a predicate for admission to the bar."

"[G]ood moral character is a necessary and proper qualification for admission to the bar. . . . In this state, the ultimate burden of proving good character rests upon the applicant. . . . [W]hile there is no litmus test

by which to determine whether an applicant for admission to the [b]ar possesses good moral character . . . no moral character qualification for [b]ar membership is more important than truthfulness and candor. . . . It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest." (Citations omitted; internal quotation marks omitted.) *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 820–21.

Upon an exhaustive review of the record, we conclude that the defendant did not " '[act] arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts' "; id., 818; in concluding that the plaintiff here lacked present good moral character. First, as to the plagiarism incident, on the plaintiff's bar application he disclosed that, in 1994, he faced disciplinary charges concerning a sixty page independent research paper that he had submitted to a professor. Rather than face a disciplinary hearing, the plaintiff entered into an agreement with the student discipline committee. The plaintiff admitted: "My paper was in violation of [Quinnipiac's] plagiarism rules in two respects: (1) I solicited the help of another in writing the paper; and (2) The paper submitted included portions copied from a law review article."

When the defendant sought some clarification concerning this incident, the plaintiff seemed unable to testify consistently. At the first hearing, the plaintiff, upon being asked whether his girlfriend "actually wrote the body of the paper," stated: "Right. And it didn't even start out that way. It kind of snowballed to that effect. It was sort of my asking her to help and her desire to help me at the time. Because of work and school and other demands it got to that point. And like I said before, it's not trying to deny responsibility for it. I know I'm

responsible for it. It's just to explain the situation."[7] At the final hearing date, however, the plaintiff testified that his earlier testimony was not accurate if one interpreted the word "write" to mean "authored." If the word "write" meant "type," however, then it was accurate.[8]

---

[7] Additional portions of the plaintiff's testimony reinforce the impression that his fiancée wrote, at a minimum, portions of his paper. During the plaintiff's opening statement to the defendant, he explained how he solicited help, stating: "I had first solicited the help of my fiancée at the time—by the time the proceeding ended she was my wife—but to do some typing. I had done the research, organized the materials. I had asked her to help me type the paper, because it was a long—large amount. It kind of snowballed from there. The time restrictions that I had, she helped put some of the pieces together, then she completed most of the first draft. I reviewed it. We went from there. But it just snowballed from initially asking her to type."

Upon being questioned by attorney Arthur A. Hiller of the defendant, the plaintiff testified as follows:

"Q. Who wrote the text of the paper? You did the research, you put down on 3 by 5 cards what each case said and what your theories and ideas were. Who put that research into a paper?

"A. It was [a] combination.

"Q. I don't understand that. Who wrote the words? Who sat down at the typewriter and typed it out? Or who dictated it? Who did the writing of the fact text of the paper?

"A. I would say my fiancée did most of the typing. In fact, she did all of the typing, because I can't type. I mean I had given her—I did the research and read it. I said, 'I want to include this and this from over here and this from over here,' and she put a lot of the pieces together. I'm not trying to be evasive. I guess I'm not understanding exactly your question."

[8] The plaintiff's attorney, attempting to clear up any confusion over the plaintiff's testimony, questioned him as follows:

"Q. All right. This is a question by attorney [Sharon] Peters, 'And your wife, or at the time your girlfriend, actually wrote the body of the paper then?' What did you answer?

"A. Right.

"Q. Is that answer correct?

"A. No, it isn't.

"Q. What's wrong with it?

"A. Well, she didn't write the body. She typed the body, put the pieces in that I had assembled for her to put in.

* * *

"Q. Is it your testimony here today then, it's important to the [defendant] that if you testified previously that you did not write the draft of the paper and that your girlfriend actually wrote the paper, you testified to that effect, that testimony is incorrect or at least needs an explanation?

In light of these inconsistencies, we conclude that the defendant was justified in viewing this testimony skeptically.

The defendant also sought to determine precisely what portions of the plaintiff's paper had been plagiarized. This inquiry was complicated by the fact that neither the plaintiff nor Quinnipiac was able to produce either a copy of the paper, or a copy of the agreement that the plaintiff had made with the Quinnipiac student disciplinary committee. On November 14, 1997, the plaintiff testified that, although he could not recall what portions of the law review article were "lifted," he stated: "It wasn't word-for-word-for-word. There were, I think significant portions from what I remember. . . . I know there was a chart. I do remember a chart that was plagiarized."[9] In his testimony on December 15, 1998, the plaintiff indicated that he had violated the student code by merely unintentionally citing portions of the paper in the endnotes to the incorrect authority and having his wife type out his notes. Although, according to the Quinnipiac student conduct code, having another party type one's paper and "reckless[ly]" citing material improperly were violations, the defendant, based on the plaintiff's confusing and seemingly contradictory testimony, could have inferred that a three semester suspension was given for something more serious.

As the defendant noted, this incident alone might not have warranted a finding that the plaintiff lacked

---

"A. It needs an explanation what write—what I meant by write at the time.

"Q. Okay. Have you now given us that explanation? Is there anything else you want to add to that explanation?

"A. No, as long as what between 'write' and 'author' is distinguished."

[9] The plaintiff sought to explain why he could not recall any other portions of the paper that were lifted. He testified that, because he already had admitted to soliciting his fiancée to help write the paper, he and his faculty designated attorney spent little time reviewing the paper for plagiarized text.

present good moral character. The plaintiff's testimony concerning an incident between himself and his former law firm, however, raised additional questions. The incident in question involved the testimony of numerous individuals and took much of the defendant's time. To summarize briefly, the plaintiff admitted calling attorney Thomas Wilson of the law firm Suisman, Shapiro, Wool, Brennan, Gray & Greenberg (Suisman) on April 17, 1988, to warn him about Gervais, who had left Basilica & Stewart and who was then employed by Suisman. Wilson, a member of the standing committee that had conducted the investigation of the plaintiff, had declined to talk with the plaintiff, and had informed him that he would have attorney Harold Haldeman, Suisman's director of administration, call him. Haldeman spoke with the plaintiff on April 22, 1998, and the plaintiff told Haldeman that the plaintiff had been informed that Gervais had embezzled money from another law firm. Within twenty-four hours, Haldeman spoke with Gervais about this allegation, without disclosing the source of his information. Gervais then called her former employer at Basilica & Stewart, attorney Russell Stewart, and told him that there were rumors being spread about her, and she asked Stewart if the plaintiff was behind them. Stewart testified that he told the plaintiff about Gervais' telephone call and, according to Stewart's recollection, the plaintiff responded, "I have absolutely nothing to do with it. . . . I haven't said nothing to anybody. I don't know what she is talking about." When asked if Stewart's testimony was accurate, however, the plaintiff responded: "I don't really remember the conversation. I don't think he asked me directly. I mean, what I—I may have denied it to him, but I don't think he came out and—I don't think it was like this, that he asked me and I answered. I think he knew, and he didn't really have to ask, and I just—I'm petrified of the woman."

On the basis of this testimony, one could reasonably conclude, as the defendant did in both its draft and final memorandums of decision, that the plaintiff's statement to Stewart "constituted a falsehood to a member of the [b]ar . . . ."

Attempting to demonstrate to the defendant that his testimony was truthful, on the final hearing date, the plaintiff testified, for the first time, that, besides calling Wilson about Gervais, the plaintiff had informed Detective William Dittman of the New London police department, who was a friend of the plaintiff for approximately twenty years, about Gervais. Dittman testified that he contacted Jeff Hill, a friend of his who worked at Suisman, about Gervais. The plaintiff also testified that the conversation with Stewart in question occurred prior to his conversation with Haldeman.

To characterize this testimony as "confusing," as the trial court did, is an understatement. As the plaintiff's attorney pointed out, however, "there has to be an explanation as to why [Gervais] was called in [to Haldeman's office]. That either has to be because [the plaintiff] did it, in which case he is not being candid with Mr. Stewart; or someone else did it, in which case he is being candid with Mr. Stewart."

We agree with this proposition, and on the basis of the entire record, we conclude that there was adequate evidence for the defendant to reach the former conclusion. Upon reviewing Haldeman's testimony, we conclude that it would have been reasonable for the defendant to find that Haldeman spoke with Gervais after he had spoken with the plaintiff.[10] This incident, in

---

[10] After describing the details of his telephone conversation with the plaintiff, Haldeman was asked: "And at anytime did you speak with Ms. Gervais about those statements?" Haldeman replied: "I spoke with Ms. Gervais within [twenty-four] hours, and I did not specifically tell her what the statements were, I just told her that I had information which I was compelled under the circumstances to talk to her about and check out with her." Gervais' testimony gives the impression that she had only one conversation with

addition to the plaintiff's admitted episode of plagiarism and the testimony surrounding that incident, was sufficient for the defendant to conclude that the plaintiff lacked present moral character for admittance to the bar.

Nonetheless, the plaintiff contends that the trial court did not conduct a de novo review, but correctly applied the standard enunciated in *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 822–23, and properly determined that the record did not support the defendant's conclusion. We disagree. In reversing the defendant's decision and remanding the matter for a new hearing, the trial court concluded "that the [defendant] mischaracterized evidence and overstated its case. Taking into consideration all of the evidence before the [defendant], *it appears to the court that the evidence of good moral character*[11] *outweighs that of the two cited incidents*. However, the court is troubled about the confusing testimony regarding the conversations with Stewart. Accordingly, it does not at this time recommend his admission to the bar." (Emphasis added.) This statement belies the plaintiff's claim that the trial court did not conduct a de novo review of the record. It demonstrates, rather, that the trial court reweighed the evidence.

---

Haldeman. There is nothing in the record to indicate that Hill ever spoke to Haldeman, or that Haldeman had another source of information about Gervais. The plaintiff argues that Haldeman had another source for his information because Haldeman stated: "I do recall that her name was never mentioned until the end of the conversation [with the plaintiff] when I said, 'And this individual's initials are TMG, correct?' And [the plaintiff responded], 'Yes, that's correct.' " Whether Haldeman had another source of information concerning Gervais was a question of fact for the defendant. We conclude that there was sufficient evidence to support its conclusion that the plaintiff was the sole source.

[11] As evidence of good moral character, the trial court pointed to the plaintiff's extensive "civic, political and religious activities" as well as the recommendations from Stewart, Dittman and a Roman Catholic priest.

This reweighing of the evidence by the trial court was improper because "the Superior Court's role in reviewing a petition for admission is not that of fact-finder. We have repeatedly stated that [t]he trier of the facts determines with finality the credibility of witnesses and the weight to be accorded their testimony." (Internal quotation marks omitted.) *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 822. Therefore, it was the function of the defendant to determine whose testimony to credit and how much weight to assign to it. "In drawing its own conclusions as to these factors, the trial court stripped the [defendant] of authority to determine qualities such as candor and credibility when assessing the moral fitness of an applicant for membership in the state bar. The Superior Court rules specifically delegate to the [defendant] the duty, power and authority to . . . determine whether such candidates are qualified as to prelaw education, legal education, morals and fitness . . . . Practice Book § [2-5]. [S]atisfaction of the requirement of moral character involves an exercise of delicate judgment on the part of those who reach a conclusion, having heard and seen the applicant for admission, a judgment of which it may be said as it was of many honest and sensible judgments in a different context that it expresses an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth. *Schware* v. *Board of Bar Examiners*, 353 U.S. 232, 248, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957) (Frankfurter, J., concurring)." (Internal quotation marks omitted.) *Scott* v. *State Bar Examining Committee*, supra, 825–26. Because there was sufficient evidence in the record to support the defendant's finding about the plaintiff's moral character, we conclude that the trial court should not have disturbed that finding.

The plaintiff also claims that, even if the trial court applied an improper standard of review, the decision of the defendant nonetheless must be reversed because it failed to follow its own rules when evaluating the plaintiff's character. Specifically, the plaintiff claims that the defendant focused on two isolated events and failed to consider the rest of his application, in violation of its own regulations. We disagree.

Article VI-4 of the defendant's Regulations Governing Admission to the Bar provides in relevant part: "The determination of present good moral character is made at the time of admission. In considering good moral character the Committee will attempt to view the applicant as a whole person and take into account the applicant's entire life history rather than limit its view to isolated events in his/her life. The Committee's inquiry into an applicant's character and fitness emphasizes honesty, fairness and respect for the rights of others and for the law in general. . . ." From the evidence presented, the defendant found that "the dishonesty and lack of integrity reflected in the plagiarism of 1994 again surfaced as a character issue for [the plaintiff] in 1998, as illustrated by his dishonest remarks to attorney Stewart." As for being isolated events, the defendant found that "the combination of evidence on these two matters, as well as the [plaintiff's] contradictory testimony before this panel, suggest otherwise. The *common theme or pattern* is that [the plaintiff] has a *continuing tendency to misrepresent himself* . . . ." (Emphasis added.) It is clear that the defendant did "view the [plaintiff] as a whole person," and resolved that, what the plaintiff viewed as isolated events, it determined were manifestations of a deeper flaw of character.

### III

We next address the question of whether the trial court improperly granted the plaintiff's motion to pro-

ceed anonymously. The defendant contends that the trial court, in granting the plaintiff's motion to proceed anonymously, improperly interpreted Practice Book § 2-50 (a)[12] as imparting a presumption of confidentiality in all proceedings concerning admission to the bar. We agree.

The following additional facts are relevant to our resolution of this issue. Simultaneously with the filing in the trial court of this petition for admission to the Connecticut bar, the plaintiff applied for permission to prosecute this action in a fictitious name. The trial court granted the application ex parte. The defendant subsequently moved for reconsideration of the ex parte order, which the trial court granted. After hearing argument on the application, the trial court concluded that Practice Book § 2-50 (a), which restricts the availability of "[t]he records and transcripts . . . of hearings conducted by the [defendant]," provides for a "presumption of confidentiality" throughout the application process. The trial court stated: "[T]he presumption of confidentiality is one which any applicant to the [defendant] would have, and that presumption of confidentiality extends, not just through the application proceeding, but subsequent proceedings as well which this proceeding is. This proceeding in fact being a reconsideration so to speak or an appeal from the [defendant's] decision. On that basis, the court is going to allow the [plaintiff] to continue to prosecute this case in a fictitious name."[13]

---

[12] Practice Book § 2-50 (a) provides: "The records and transcripts, if any, of hearings conducted by the state bar examining committee or the several standing committees on recommendations for admission to the bar shall be available only to such committee or to a judge of the superior court or to the statewide grievance committee or, with the consent of the applicant, to any other person, unless otherwise ordered by the court."

[13] Prior to argument, the plaintiff also filed a motion to seal the file pursuant to Practice Book §§ 11-20 and 2-50 (a). The trial court granted this motion and the defendant has not challenged that ruling on appeal.

Whether § 2-50 provides for a presumption of confidentiality throughout the judicial process, as opposed to the proceedings before the defendant, is a question of first impression for this court. It also presents a question of interpretation of the meaning of the rules of practice, which is governed by the same principles as those governing statutory interpretation. *State* v. *Pare*, 253 Conn. 611, 622, 755 A.2d 180 (2000) ("principles of statutory construction apply 'with equal force to Practice Book rules' "). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the

language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

Section 2-50 (a) provides: "The records and transcripts, if any, of hearings conducted by the state bar examining committee or the several standing committees on recommendations for admission to the bar shall be available only to such committee or to a judge of the superior court or to the statewide grievance committee or, with the consent of the applicant, to any other person, unless otherwise ordered by the court." We assume, without deciding, that the language, "records and transcripts, if any, of hearings conducted by the state bar examining committee or the several standing committees on recommendations for admission to the bar," would include enough of the record in the present case so as to support an application to proceed anonymously. We also acknowledge that the language of § 2-50 (a) is sufficiently broad so as to be susceptible of a meaning that it applies to judicial proceedings flowing from the proceedings of the defendant, as well as those proceedings themselves. Nonetheless, we conclude that § 2-50 (a) does not apply to the present case, which is a plenary judicial action by the plaintiff challenging the findings and conclusions of the defendant. As we explain in the following discussion, there is a strong

presumption of openness of judicial proceedings, and that presumption includes whether, in an individual case, a party may proceed anonymously. Given that presumption, in the absence of a strong showing that § 2-50 (a) was meant to trump that principle of openness, we are not inclined to interpret it in that manner. Put another way, if the principle of openness were to be trumped by the rules of practice adopted by the judges in an entire category of cases, we presume that the rule would say so with sufficient clarity. There is no such clarity in § 2-50 (a). We conclude, therefore, that it does not apply to the present plenary judicial action challenging the ruling of the defendant.

The plaintiff points out that, prior to July 1, 1986, Practice Book, 1981, § 32 (c), now § 2-50 (b), treated records and transcripts of grievance committee proceedings identically to records and transcripts of proceedings before the defendant.[14] In 1986, however, § 32 was amended and reorganized. The new § 32 (b), now § 2-50 (b),[15] was amended to provide for disclosure of

---

[14] Practice Book, 1981, § 32, provided in relevant part: "(b) The records and transcripts, if any, of hearings conducted by the state bar examining committee or the several standing committees on recommendations for admission to the bar shall be available only to such committee or to the statewide grievance committee or, with the consent of the applicant, to any other person, unless otherwise ordered by the court.

"(c) The records and transcripts, if any, of hearings conducted by the statewide grievance committee shall be available only to such committee or its counsel or to the standing committee on recommendations for admission to the bar, or, with the consent of the attorney, to any other person, unless otherwise ordered by the court. . . ."

[15] Practice Book § 2-50 (b) provides: "For purposes of this section, the record in a grievance proceeding shall consist of the following: (1) the grievance panel's record, (2) the reviewing committee's record, (3) any statement submitted to the statewide grievance committee concerning a proposed decision, (4) any request submitted to the statewide grievance committee concerning a reviewing committee decision, and (5) the decision and record, if any, of the statewide grievance committee or reviewing committee. The statewide grievance committee shall maintain the record of each grievance proceeding, including presentments. All such records pertaining to grievance complaints that have been filed on or after July 1, 1986, and that have not been dismissed by the statewide grievance committee, shall

major portions of grievance committee proceedings. The plaintiff contends that, if bar application proceedings were intended to be open to the public, then § 2-50 (a) would have been amended so as to provide for such disclosure at the same time that § 2-50 (b) was amended.

We disagree with this contention for two reasons. First, it does not take into account the strong presumption of openness of judicial proceedings that we previously have articulated. Second, the 1986 amendments regarding grievance committee proceedings were adopted by the judges in response to widespread public dissatisfaction with the then prevailing practice of confidentiality of such proceedings. The fact that, absent such dissatisfaction regarding proceedings before the defendant, the judges also did not make all of its records equally open, does not mean that they also intended them to apply beyond the administrative level.

Given this interpretation of § 2-50, the question becomes, as a matter of judicial policy, whether the policy of confidentiality of proceedings before the defendant should extend to actions challenging such proceedings. In light of the overriding judicial principle

be public. All such records pertaining to grievance complaints that have been filed on or after July 1, 1986, and that have been dismissed by the statewide grievance committee shall be available only to such committee or its counsel, to reviewing committees, to grievance panels, to a judge of the superior court, to the standing committee on recommendations for admission to the bar, or, with the consent of the respondent, to any other person, unless otherwise ordered by the court. Notwithstanding the above, for all complaints filed on or after July 1, 1986, the following shall be public records: (1) the grievance panel's probable cause determination, (2) the reviewing committee's proposed or final decision, (3) the statewide grievance committee's decision and (4) transcripts of hearings held following a determination that probable cause exists except that records of complaints dismissed pursuant to Section 2-32 (a) (2) shall not be public. For purposes of this section, all grievance complaints that are pending before a grievance panel on July 1, 1986, shall be deemed to have been filed on that date."

of openness of courtroom proceedings, we conclude that it should not.

The presumption of openness of court proceedings, which is implicated in applications to proceed anonymously, is a fundamental principle of our judicial system. Addressing the importance of open trials, the United States Supreme Court has stated: "The roots of open trials reach back to the days before the Norman Conquest when cases in England were brought before 'moots,' a town meeting kind of body such as the local court of the hundred or the county court. Attendance was virtually compulsory on the part of the freemen of the community, who represented the 'patria,' or the 'country,' in rendering judgment." *Press-Enterprise Co.* v. *Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). "The open trial . . . plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." Id., 508. Openness is of such critical importance that, at least concerning criminal trials, "the press and general public have a constitutional right of access" to them. *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 603, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982).[16] Although the purpose behind open proceedings is not as impaired by granting permission to proceed anonymously as it is by closure

---

[16] Although the United States Supreme Court has not extended this constitutional right of access to civil proceedings, it has noted that "historically both civil and criminal trials have been presumptively open." *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 580 n.17, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). Without deciding the extent of the right of access to open civil proceedings, we conclude that, at a minimum, there is a presumption of open proceedings in civil cases.

of a trial, "[n]evertheless, there remains a clear and strong . . . interest in ensuring that [w]hat transpires in the courtroom is public property." (Internal quotation marks omitted.) *Doe* v. *Stegall*, 653 F.2d 180, 185 (5th Cir. 1981).

Despite a presumption of open court proceedings, however, both the United States Supreme Court and this court have acknowledged that this right is not absolute. See, e.g., *Globe Newspaper Co.* v. *Superior Court*, supra, 457 U.S. 606 ("[a]lthough the right of access to criminal trials is of constitutional stature, it is not absolute"); *State* v. *Frazier*, 185 Conn. 211, 230–31, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982) ("[A]n accommodation must sometimes be made between the individual's right to a public trial and other societal interests that might justify closing the courtroom to the public. . . . We have indicated that closure of a courtroom should be limited to those situations where such action is demonstrably necessary to further the administration of justice." [Citation omitted; internal quotation marks omitted.]).

For example, the legislature has identified several areas where, due to the sensitivity of the topic, the extremely personal nature of the issues, or the age of the participants, the policy of open proceedings has been abridged by overriding privacy concerns. See, e.g., General Statutes § 46b-11 (permitting closed hearings and sealing of records in "family relations matter" where court determines "the welfare of any children involved or the nature of the case so requires"); General Statutes § 46b-49 (permitting closed hearings in divorce, separation and annulment proceedings when "in the interests of justice and the persons involved"); General Statutes § 46b-122 (exclusion from courtroom in juvenile matters of "any person whose presence is, in the court's opinion, not necessary"); General Statutes § 54-76c (sealing of court file during investigation to deter-

mine whether defendant "is eligible to be adjudged a youthful offender"); General Statutes § 54-76h (requiring that all youthful offender proceedings except those under § 54-76c be private); General Statutes § 54-86f (holding in camera hearing concerning evidence of sexual conduct of victim in prosecution for sexual assault); General Statutes § 54-86g (permitting taking of child's testimony in child abuse cases outside of courtroom).[17]

Our rules of practice embody the same presumption of openness. Practice Book § 11-20[18] provides, in gen-

[17] So carefully has the legislature crafted exceptions to the policy of open proceedings that General Statutes § 51-164x (a) provides: "Any person affected by a court order which prohibits any person from attending any session of court, except any session of court conducted pursuant to section 46b-11, 46b-49, 46b-122 or 54-76h or any other provision of the general statutes under which the court is authorized to close proceedings, whether at a pretrial or trial stage, shall have the right to the review of such order by the filing of a petition for review with the Appellate Court within seventy-two hours from the issuance of such court order." See also Practice Book § 11-20 (d) (same).

[18] Practice Book § 11-20 provides: "(a) Except as provided in this section and except as otherwise provided by law, including Section 13-5, the judicial authority shall not order that the public, which may include the news media, be excluded from any portion of a proceeding and shall not order that any files, affidavits, documents, or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited.

"(b) Upon motion of any party, or upon its own motion, the judicial authority may order that the public be excluded from any portion of a proceeding and may order that files, affidavits, documents or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited if the judicial authority concludes that such order is necessary to preserve an interest which is determined to override the public's interest in attending such proceeding or in viewing such materials. Any such order shall be no broader than necessary to protect such overriding interest.

"(c) In connection with any order issued pursuant to subsection (b) of this section, the judicial authority shall, on the record in open court, articulate the overriding interest being protected and shall specify its findings underlying such order. The time and date of any such order shall be entered by the court clerk in the court file together with such order.

"(d) With the exception of orders concerning any session of court conducted pursuant to General Statutes §§ 46b-11, 46b-49, 46b-122 or any other provision of the General Statutes under which the judicial authority is authorized to close proceedings, whether at a pretrial or trial stage, no order

eral terms, that the public may not be excluded from judicial proceedings, and that records of court proceedings may not be sealed, unless the court identifies, on the record and in open court, "an interest which is determined to override the public's interest in attending such proceeding or in viewing such materials." Practice Book § 11-20 (b).

The principle of openness of judicial proceedings includes the question of whether one may proceed anonymously therein, because the question of *who* is using the judicial system is ordinarily as much a part of that principle as *why* it is being used. Accordingly, this court has held that: "The privilege of using fictitious names in actions should be granted only in the *rare case* where the nature of the issue litigated and the interest of the parties demand it and no harm can be done to the public interest." (Emphasis added.) *Buxton* v. *Ullman*, 147 Conn. 48, 60, 156 A.2d 508 (1959), appeal dismissed sub nom. *Poe* v. *Ullman*, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961).

excluding the public from any portion of a proceeding shall be effective until seventy-two hours after it has been issued. Any person affected by such order shall have the right to the review of such order by the filing of a petition for review with the appellate court within seventy-two hours from the issuance of such order. The timely filing of any petition for review shall stay such order.

"(e) With the exception of orders concerning the confidentiality of records and other papers, issued pursuant to General Statutes § 46b-11 or any other provision of the General Statutes under which the court is authorized to seal or limit the disclosure of files, affidavits, documents or other materials, whether at a pretrial or trial stage, any person affected by a court order that seals or limits the disclosure of any files, documents or other materials on file with the court or filed in connection with a court proceeding, shall have the right to the review of such order by the filing of a petition for review with the appellate court within seventy-two hours from the issuance of such order. Nothing under this subsection shall operate as a stay of such sealing order.

"(f) The provisions of this section shall not apply to settlement agreements which have not been incorporated into a judgment of the court."

*Buxton* was a declaratory judgment action involving the constitutionality of General Statutes (1958 Rev.) §§ 53-32 and 54-196, now repealed, which "prohibit[ed] the use of any drug, medicinal article or instrument for the purpose of preventing conception, and [which] prohibit[ed] the counseling or abetting of such use." Id., 49–50. In approving the use of fictitious names for five of the plaintiffs, we stated: "Because of the intimate and distressing details alleged in these complaints, it is understandable that the parties who are allegedly medical patients would wish to be anonymous." Id., 60. Thus, by the language in *Buxton*, this court set a high threshold for granting applications to proceed anonymously, such as cases involving deeply personal issues. See, e.g., *Doe* v. *Diocese Corp.*, 43 Conn. Sup. 152, 153, 647 A.2d 1067 (1994) (plaintiff granted permission to proceed anonymously in action against defendant churches and church diocese where he alleged being abused by clergyman several hundred times over seven years beginning at age twelve); *Doe* v. *Maher*, 40 Conn. Sup. 394, 395, 515 A.2d 134 (1986) (plaintiff authorized to proceed anonymously in action involving regulations restricting funding of abortions under state medicaid program).

Given the strong principle of openness in our judicial system as articulated by the United States Supreme Court, this court, our legislature, and our rules of practice, and considering our holding in *Buxton* that applications to proceed anonymously should be granted only in rare instances, we decline to apply, as the trial court did in this case, a presumption of confidentiality to a judicial proceeding challenging a decision by the defendant. Therefore, we remand this issue to the trial court for a determination of whether, given the presumption of openness in all judicial proceedings, "the plaintiff has a substantial privacy right which outweighs the customary . . . presumption of openness in judicial

proceedings." (Internal quotation marks omitted.) *Doe* v. *Frank*, 951 F.2d 320, 323 (11th Cir. 1992).

The plaintiff asserts that, even if there were a presumption of open proceedings, the trial court's order should be affirmed because his substantial privacy interest in his moral character outweighs the presumption and supports his use of a fictitious name. He argues that the defendant's recommendation "is harmful well beyond embarrassment or economic loss. His moral character permeates and is vital to virtually every aspect of his personal, social, and professional life. His relationships depend on it." We are not persuaded.

Because "[l]awsuits are public events . . . [a] plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature . . . ." Id., 324. A plaintiff's desire to avoid "economic and social harm as well as embarrassment and humiliation in his professional and social community" is normally "insufficient to permit him to appear without disclosing his identity." (Internal quotation marks omitted.) *Free Market Compensation* v. *Commodity Exchange, Inc.*, 98 F.R.D. 311, 312–13 (S.D.N.Y. 1983). Nonetheless, we leave this question to the informed discretion of the trial court upon our remand. In that hearing, the plaintiff will be permitted to present his claim for anonymity, to be weighed against the presumption of openness, in accordance with the principles that we have identified.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for the defendant on the plaintiff's petition for admission to the bar, and for further proceedings on the plaintiff's petition to proceed anonymously.

In this opinion KATZ and VERTEFEUILLE, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, concurring. I concur in the judgment and agree with the reasoning in parts I and II of the majority opinion. In addition, with respect to part III of the majority opinion, I agree that the trial court improperly relied upon Practice Book § 2-50 (a) in granting the plaintiff's application to proceed anonymously. I believe, however, that the trial court committed this error by employing the same flawed interpretative methodology that the majority applies in its opinion. The majority's analysis highlights one of the many problems inherent in the abandonment of the plain meaning rule as recently announced in *State* v. *Courchesne*, 262 Conn. 537, 563, 570, 816 A.2d 562 (2003). See *W & D Acquisition, LLC* v. *First Union National Bank*, 262 Conn. 704, 716–18, 817 A.2d 91 (2003) (*Zarella, J.*, concurring).

The trial court in the present case granted the plaintiff's application to proceed anonymously because it concluded that § 2-50 (a) contains a "presumption of confidentiality" that extends to an appeal to the Superior Court from the defendant's decision. Practice Book § 2-50 (a) provides: "The *records* and *transcripts*, if any, *of hearings conducted by the state bar examining committee* or the several standing committees on recommendations for admission to the bar shall be available only to such committee or to a judge of the superior court or to the statewide grievance committee or, with the consent of the applicant, to any other person, unless otherwise ordered by the court."[1] (Emphasis added.) In my view, the plain meaning of the words, "records and transcripts . . . of hearings conducted by the state bar examining committee," is *records and transcripts of hearings conducted by the state bar examining committee.*

---

[1] Likewise, Practice Book § 2-50 is entitled, "Records of Statewide Grievance Committee, Grievance Panel and Bar Examining Committee."

Rather than apply the plain meaning of the Practice Book provision, however, the trial court concluded that the provision embodied a generic "presumption of confidentiality" that authorized the filing of this action under a fictitious name. I do not see how a Practice Book provision providing for the confidentiality of "records and transcripts . . . of hearings" can be read to authorize the filing of an action under a fictitious name. There is nothing in the text of § 2-50 (a) to suggest that it does. Indeed, § 2-50 (a) is silent as to whether and how appeals may be filed in the Superior Court, much less whether they may be filed under fictitious names. Thus, I would hold simply that the plain meaning of § 2-50 (a) makes clear that it was improper for the trial court to rely on this provision in granting an application to proceed anonymously.

The majority, by contrast, "assume[s], without deciding, that the language, 'records and transcripts, if any, of hearings conducted by the state bar examining committee' . . . would include enough of the record in the present case so as to support an application to proceed anonymously." To the extent that the majority means by this statement, which is unsupported by any analysis, that, based on the text or otherwise, § 2-50 (a) can be read to authorize the filing of an action under a fictitious name, I disagree. I also disagree that this court should assume the answer to this question, which I view as the very issue that this court must resolve in the present case.[2]

[2] Indeed, the majority implies that, were there not a strong presumption of openness in court proceedings, it might well interpret the provision as did the trial court. The majority states, "[g]iven [the strong presumption of openness of judicial proceedings], in the absence of a strong showing that § 2-50 (a) was meant to trump that principle of openness, we are not inclined to interpret it in that manner." In my view, irrespective of the presumption of openness, it would be incorrect to ignore the plain meaning of the provision and interpret it to authorize the filing of an action under a fictitious name.

The majority, having assumed the answer to the question that this court should be deciding, then asks, as did the trial court, whether § 2-50 (a) "impart[s] a presumption of confidentiality in all proceedings concerning admission to the bar." In answering this abstract and irrelevant question, the majority begins by stating that "the language of § 2-50 (a) is sufficiently broad so as to be susceptible of a meaning that it applies to judicial proceedings flowing from the proceedings of the defendant . . . ." Ultimately, however, the majority, unlike the trial court, concludes that "§ 2-50 (a) does not apply to the present case" because of the "strong presumption of openness of judicial proceedings . . . ." Yet, the only reason the majority comes to a conclusion different than that of the trial court is that it weighs differently, "as a matter of judicial policy," the potential applications of presumptions of confidentiality and openness. I would conclude that, irrespective of how one might balance these presumptions and irrespective of whether § 2-50 (a) applies to judicial proceedings, this Practice Book provision simply does not authorize the filing of an action under a fictitious name.

Moreover, almost by definition, the majority's interpretative approach, which debates the weight of these presumptions unanchored by any serious textual analysis, leads to no one correct answer. On the contrary, it is another example of a "nebulous relativistic approach . . . [that] virtually guarantees that there will be some evidence for nearly any interpretation that a court may wish to advance." *State* v. *Courchesne*, supra, 262 Conn. 631–32 (*Zarella, J.*, with whom *Sullivan, C. J.*, joins, dissenting). In my dissenting opinion in *Courchesne*, I explained that such an approach to statutory interpretation "expands the judiciary's power to the detriment of the legislature by allowing courts to depart from the plain meaning of the law under the guise of interpretation." Id., 631 (*Zarella, J.*, with whom *Sullivan, C. J.*,

joins, dissenting). Likewise, when applied to our rules of court, the majority arrogates the power to ignore the plain meaning of the rules adopted by the Superior Court judges of this state. Thankfully, in the present case, the majority's weighing of the relevant presumptions leads to a conclusion that is consistent with the plain language of § 2-50 (a). Next time, the law may not be so fortunate.

Accordingly, I concur.