CLERK OF THE SUPERIOR COURT, GEOGRAPHICAL
AREA NUMBER SEVEN ET AL. *v.* FREEDOM
OF INFORMATION COMMISSION
(SC 17273)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Zarella and Lavery, Js.*

* The listing of justices reflects their seniority status on this court as of the date of argument.

This case originally was argued before a panel of this court consisting of Chief Justice Sullivan and Justices Borden, Norcott, Katz and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte ordered that the case be considered en banc. Accordingly, Justice Palmer and Chief Judge Lavery of the Appellate Court were added to the panel. They have read the record, briefs and transcript of the oral argument.

Argued February 10, 2005—officially released May 2, 2006

*Victor R. Perpetua*, appellate attorney, with whom, on the brief was *Mitchell W. Pearlman*, general counsel, for the appellant (defendant).

*Martin R. Libbin*, deputy director of legal services, for the appellees (plaintiffs).

*Opinion*

SULLIVAN, C. J. The principal issue in this appeal is whether certain records created and retained by the plaintiffs, the clerk of the Superior Court, geographical area number seven (clerk), and the state judicial branch (judicial branch), are related to the judicial branch's administrative functions and, therefore, are subject to disclosure under the Freedom of Information Act (act), General Statutes § 1-200 et seq. The defendant, the freedom of information commission (commission), appeals from the judgment of the trial court sustaining the plaintiffs' appeal from the commission's decision that the records were subject to the provisions of the act. The commission claims on appeal that, inter alia, the trial court improperly concluded that, because the records did not relate exclusively to an administrative function, they were exempt from disclosure under General Stat-

utes §§ 1-200 (1) (A),[1] 1-210 (a)[2] and 1-200 (5).[3] We affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. On January 28, 2001, Russell Collins, an attorney with the law firm of Russell Collins, LLC, submitted a letter to the clerk requesting permission on behalf of his firm to inspect the court's " '[p]ending book' "[4] and " 'day-

[1] General Statutes § 1-200 (1) provides in relevant part: " 'Public agency' or 'agency' means:

"(A) Any executive, administrative or legislative office of the state or any political subdivision of the state . . . and also includes any judicial office, official, or body or committee thereof but only with respect to its or their administrative functions . . . ."

[2] General Statutes § 1-210 (a) provides: "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. Any agency rule or regulation, or part thereof, that conflicts with the provisions of this subsection or diminishes or curtails in any way the rights granted by this subsection shall be void. Each such agency shall keep and maintain all public records in its custody at its regular office or place of business in an accessible place and, if there is no such office or place of business, the public records pertaining to such agency shall be kept in the office of the clerk of the political subdivision in which such public agency is located or of the Secretary of the State, as the case may be. Any certified record hereunder attested as a true copy by the clerk, chief or deputy of such agency or by such other person designated or empowered by law to so act, shall be competent evidence in any court of this state of the facts contained therein. Each such agency shall make, keep and maintain a record of the proceedings of its meetings."

[3] General Statutes § 1-200 (5) provides: " 'Public records or files' means any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency, or to which a public agency is entitled to receive a copy by law or contract under section 1-218, whether such data or information be handwritten, typed, tape-recorded, printed, photostated, photographed or recorded by any other method."

[4] Collins cited Practice Book § 7-1, which provides in relevant part: "The clerk shall keep a record of all pending cases, including applications and petitions made to the court, together with a record of each paper filed and

books' "[5] for the period from January 2, 2002, to January 29, 2002, any ledgers identifying cases currently pending before the court and any other records that would allow identification of pending cases in " 'pre-arraignment' " status.[6] On January 30, Martin R. Libbin, an attorney employed by and representing the judicial branch, denied the request on the ground that the requested records did not involve an administrative function of the judicial branch within the meaning of § 1-200 (1) (A) and, therefore, were not subject to the act. Libbin advised Collins, however, that General Statutes § 51-5b (b)[7] "allows persons seeking access to information contained in the [judicial branch's] combined criminal and motor vehicle informational system to request custom reports" and provided Collins with contact information for obtaining such reports.

On February 5, 2002, Collins submitted another letter to the clerk in which he requested daybooks for the

order made or judgment rendered therein, with the date of such filing, making or rendition. . . . ."

[5] Collins cited Practice Book § 7-4, which provides in relevant part: "The clerk shall keep daybooks in which to enter each case on the date upon which the matter is filed on a docket of the court location. Each entry shall state the first named plaintiff and the first named defendant, unless otherwise prohibited by statute or ordered by the judicial authority, the date of filing and the number assigned to the case. . . . ."

[6] Geographical area number seven of the Superior Court handles only criminal and motor vehicle matters.

[7] General Statutes § 51-5b (b) provides: "Any person or public agency seeking on line or dial up access to any data processing system operated and administered by the Office of the Chief Court Administrator, or seeking information stored in such data processing system in a format other than as provided by the Office of the Chief Court Administrator, may be required to pay to the Office of the Chief Court Administrator an amount, as established in a fee schedule determined by the Office of the Chief Court Administrator, for deposit by the Office of the Chief Court Administrator in a fund established in subsection (a) of this section. Such fee schedule may include reasonable charges for personal services, fringe benefits, supplies and any other expenses related to maintaining, improving and providing such data processing services including, but not limited to, program modifications, training expenses, central processor user time and the rental and maintenance of equipment."

period from January 30, 2002, to February 6, 2002, and "any nonexempt information maintained within any computer storage system that reflects in regard to each Defendant in any criminal case or action where: it is alleged that such Defendant committed a criminal offense . . . and such case or action was first filed against such Defendant during the time period from January 15, 2002 to February 6, 2002; and such case or action is currently pending in the [court]; any of the following;  ⁄

"a. the Defendant's name;

"b. the Defendant's address;

"c. the Defendant's date of birth;

"d. the Docket numbers of the criminal charges filed against the Defendant;

"e. the date of the next Court hearing in the Defendant's case;

"f. the nature, or type, of the next Court hearing in the Defendant's case;

"g. whether such Defendant is represented by counsel;

"h. whether the Defendant has a jail code, etc., or is otherwise currently incarcerated."

Libbin again denied the request on the ground that the requested information was not administrative in nature. Collins then filed a complaint with the commission claiming that the plaintiffs had violated the act by denying his requests. After a hearing on the complaint, the commission found that the pending book[8] and the

---

[8] The commission described the pending book as "a computer printout of all cases pending at a given court location, delivered from the statewide Judicial Information Systems office once or twice a week . . . ."

daybook[9] contained some information that was exempt from the act, namely, information concerning juveniles, sealed records and erased records. Redacting the exempt information would involve "a time consuming and burdensome process of checking each file in the [judicial branch's criminal/motor vehicle computer system]" (computer system). The computer system was "centrally operated by the [judicial branch], but . . . available locally to the [clerk]," and was continually updated to indicate whether the cases involved juveniles or had been sealed or erased.

Although the commission concluded that the pending book and daybook were not disclosable, it concluded that the information in the computer system itself was subject to the act. Relying on this court's decision in *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, 209 Conn. 204, 550 A.2d 663 (1988), the commission concluded that the computer system records "serve both 'administrative functions' and 'adjudicative functions,'" and that "any records relating to the performance of [administrative functions] must be [made] available pursuant to [§ 1-210], unless doing so would in some manner interfere with the performance of judicial functions. [Id., 208] . . . ." (Internal quotation marks omitted.) The commission further concluded that, although "new administrative procedures may be required to guarantee the timely entry of new data concerning exempt records into the [computer system] . . . pending case information . . . can be provided from computerized court records . . . without interfering with the performance of judicial functions."[10] Accordingly, it concluded that the

---

[9] The commission described the daybook as "a paper log of all cases received by a given court, created by the clerks of that court and based, for criminal matters, upon the receipt of a uniform arrest report . . . ."

[10] The commission found that "new administrative procedures may be required to guarantee the timely entry of new data concerning exempt records into the [computer system] in order that its records can be available for public inspection at certain periodic intervals to be determined by the

computer system records were administrative records subject to the act and ordered the judicial branch periodically to allow Collins to inspect the records. The commission stayed the order for ninety days in order to allow the judicial branch "to implement such procedures as it considers appropriate concerning the periods for public inspection and the timely entry of new data by its staff into [the computer system]."

The plaintiffs appealed from the commission's decision to the trial court, which sustained the appeal. The court noted that the commission had found that compliance with Collins' request to review the pending book and the daybook would be " 'time consuming and burdensome' " but that access to the computer system could be provided " 'without interfering with the performance of judicial functions.' . . . Based on this finding of the hearing officer, the [commission] ordered the judicial branch to 'periodically allow [Collins] to inspect the requested records of the [computer system].' . . . This order is foreign to the language of § 1-210 (1) (A) which restricts disclosure only to administrative matters because the order does not allow the judicial branch to screen what records deal with a judicial function and which deal with administrative functions." Accordingly, the court concluded that the commission had "extended its reach beyond that contemplated by the legislature as expressed in § 1-210 (1) (A)" and sus-

---

[judicial branch]." It also found that "such new administrative procedures would be reasonable, and therefore that the records requested can 'reasonably' be made available from the [computer system] for at least periodic inspection, as envisioned by [General Statutes] § 1-211 . . . ."

General Statutes § 1-211 (a) provides in relevant part: "Any public agency which maintains public records in a computer storage system shall provide, to any person making a request pursuant to the Freedom of Information Act, a copy of any nonexempt data contained in such records, properly identified, on paper, disk, tape or any other electronic storage device or medium requested by the person, if the agency can reasonably make such copy or have such copy made. . . ."

tained the plaintiffs' appeal. The commission appealed from the trial court's judgment to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The commission claims on appeal that the trial court improperly concluded that (1) the information in the computer system is not solely administrative but involves the adjudication of cases and, therefore, is exempt from the act, (2) the difficulty of providing access to the pending book and daybooks affected the administrative nature of the information contained in the computer system, and (3) permitting periodic access to the computer system records would require the judicial branch to screen each record to determine whether it involved a judicial function or an administrative function. We conclude that the judicial branch's administrative functions, as that phrase is used in § 1-200 (1) (A), consist of activities relating to its budget, personnel, facilities and physical operations. Because the information in the computer system did not relate to these activities, we conclude that the trial court properly determined that the computer records did not constitute public records within the meaning of §§ 1-200 (5) and 1-210 (a) and, therefore, were not subject to the act.

As a preliminary matter, we set forth our standard of review. "Ordinarily, we give great deference to the construction given a statute by the agency charged with its enforcement. . . . [T]he construction and interpretation of a statute is a question of law for the courts where the administrative decision is not entitled to special deference, particularly where . . . the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations." (Citations omitted; internal quotation marks omitted.) *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 718, 546 A.2d 830 (1988). Although this court previously

has construed the provisions of the act as they apply to the judicial branch; see, e.g., *Connecticut Bar Examining Committee* v. *Freedom of Information Commission,* supra, 209 Conn. 210–11; we have not addressed the application of the act to the specific types of judicial records at issue in the present case. Accordingly, our standard of review is de novo. *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 716–20.

We begin our analysis with the language of the relevant statutes. Section 1-210 (a) provides that all public records are subject to the act. Section 1-200 (5) provides in relevant part: " 'Public records or files' means any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a *public agency* . . . ." (Emphasis added.) Section 1-200 (1) (A) defines " '[p]ublic agency' " to include "any judicial office, official, or body or committee thereof but *only with respect to its or their administrative functions* . . . ." (Emphasis added.) Thus, the act applies only to records prepared by a subdivision of the judicial branch in the course of carrying out its administrative functions.

This court previously construed the scope of the phrase " 'administrative functions' " as used in § 1-200 (1) (A), formerly codified at General Statutes § 1-18a (a), in *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* 192 Conn. 234, 239, 472 A.2d 9 (1984). In that case, the defendant, Raphael Podolsky, had requested notice of and access to all meetings of the plaintiff rules committee of the Superior Court pursuant to the act. Id., 235. When the request was denied, Podolsky filed a complaint with the commission, which ordered the plaintiff to provide him with notice of and access to the meetings. Id., 235–36. The plaintiff appealed to the trial court, which sustained the appeal. Id., 236. The court determined that the plaintiff was subject to the open meetings provisions of the

act; see General Statutes § 1-225, formerly codified at General Statutes § 1-21; but that the application of the provisions to the judicial branch violated the state constitutional separation of powers doctrine. *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 238. Podolsky then appealed to this court. Id., 237.

This court affirmed the judgment of the trial court on the alternate ground that, as a matter of statutory interpretation, the open meetings provisions of the act did not apply to the plaintiff. Id., 239. Chief Justice Peters, writing for the court, began her analysis by considering the meaning of the phrase " 'administrative functions.' " Id. She stated that "[t]he term 'administrative' has no generally accepted plain meaning, but is commonly used to refer to a wide range of activities extending from the day to day management of an organization or an estate's internal housekeeping functions to the conduct of the entire official business of the government." Id. She also stated that, in construing the scope of § 1-200 (1) (A), "we must take account of our duty, when presented with a constitutional challenge to a validly enacted statute, to construe the statute, if possible, to comport with the constitution's requirements. . . . This general principle of construction is of particular importance in the context of the present litigation, which involves extraordinarily sensitive issues surrounding the delicate balance among the coordinate branches of our state government." (Citations omitted.) Id., 240. She further noted that, when the act was first enacted in 1975, it did not apply to constitutional courts. Id. The legislative history of the act indicated that "[t]he reason these courts were not included is that there is a grave constitutional problem in legislative rule-making for constitutional courts." (Internal quotation marks omitted.) Id., 241. Turning to the legislative history of the 1977 amendment to the act, which

made it applicable to constitutional courts, Chief Justice Peters stated that "[t]here is no indication in the recorded history that the legislature perceived this amendment as having any particular constitutional significance, and certainly no evidence that it was intended to stimulate a confrontation with the Judicial Department by extending the act's open meeting provision to a significant portion of the judiciary's business. *The legislative history, then, supports a restrictive reading of the term 'administrative.'* " (Emphasis added.) Id., 242; see also *State* v. *Snook*, 210 Conn. 244, 251, 555 A.2d 390 ("[t]his court should try, whenever possible, to construe statutes to avoid a constitutional infirmity" [internal quotation marks omitted]), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). Chief Justice Peters concluded that, because the plaintiff "plays no role in the management of the internal institutional machinery of the court system" but, instead, "sets the parameters of the adjudicative process that regulates the interactions between individual litigants and the courts . . . [it] does not perform 'administrative functions' within the meaning of [§ 1-200 (1) (A)] and is not subject to the provisions of the [act]." *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 246.

Thus, we have recognized that the legislature intended for the scope of the act as applied to the courts to be much more limited than its scope as applied to state agencies. Not only did the legislature intend for the act to be limited to records prepared by a subdivision of the judicial branch *only* in the course of carrying out an administrative function, but it also intended for the phrase "administrative functions" to be construed narrowly. Thus, there is a twofold restriction on the scope of the act as applied to the judicial branch.

New York case law is instructive on the scope of the term "administrative" as applied to judicial records in

this context. In *Quirk* v. *Evans*, 116 Misc. 2d 554, 555, 455 N.Y.S.2d 918 (1982), the petitioners sought certain information from the New York office of court administration (office), pursuant to that state's freedom of information law. The office claimed that it was exempt from the law because the law specifically exempted "the courts of the state, including any municipal or district court . . . ." (Internal quotation marks omitted.) Id., 556–57. The court rejected that argument, concluding that "[t]he [l]egislature, in enacting [the freedom of information law] intended the phrase 'courts of the state' to have its commonly understood meaning—tribunals adjudicating rights and status—and not the strained meaning advanced by [the] respondent . . . ." Id., 557. It noted that the office's functions were "largely concerned with the staffing and physical operation of the courts, as opposed to the adjudicatory functions of the [courts] . . . ."[11] Id. It concluded, therefore, that the office was "an agency, not a court, and it is therefore subject to the [f]reedom of [i]nformation [l]aw." Id., 559; see also *Babigian* v. *Evans*, 104 Misc. 2d 140, 142, 427 N.Y.S.2d 688 (1980) (office of court administration is not court and is not exempt from complying with request for personnel information pursuant to freedom of information law).

In *Harvey* v. *Hynes*, 174 Misc. 2d 174, 175, 665 N.Y.S.2d 1000 (1997), the respondent, the district attorney, sought to reargue a court order granting the petitioner's request for the grand jury testimony of all witnesses who had testified against him in a criminal

---

[11] The court also noted that the office "conducts statistical studies of trial court workloads; conducts seminars and informational conferences for both judicial and nonjudicial employees; handles assignments of staffing and projection of staffing needs of nonjudicial personnel; evaluates the administrative impact of [l]egislation on the courts; provides budgetary assistance and projections; and, finally, is the repository of certain records kept in the course of judicial and related proceedings in the [s]tate." *Quirk* v. *Evans*, supra, 116 Misc. 2d 557.

case. The court previously had ordered the release of the testimony, reasoning that, because the information already had been disclosed to the petitioner, there was no basis for keeping the testimony secret. Id. The respondent sought to reargue the matter, claiming that the information should not be released because it constituted "court records." Id. The court stated that "[w]hile such a ground does not implicate the confidentiality concerns of third parties, it does implicate the court's control over its own records.

"New York has long recognized that courts have inherent authority over their own records . . . . By explicitly exempting the judiciary from [the freedom of information law's] coverage . . . the [l]egislature has assured that courts will continue to control their own records. Although such an exemption may not be constitutionally mandated . . . it is evidently premised on legislative respect for the independence of the judiciary as a separate coequal branch of government . . . . This exclusion of courts from [the freedom of information law's] coverage serves a public policy of ensuring the independence of the judiciary. . . . [T]his policy merits protection just as the confidentiality rights of third parties." (Citations omitted.) Id., 179–80. The court concluded that, because the grand jury minutes were court records, they were exempt. Id.; see also *Daily News Publishing Co.* v. *Office of Court Administration*, 186 Misc. 2d 424, 425–27, 718 N.Y.S.2d 800 (2000) (information stored in criminal records information management system database is court record and is not subject to freedom of information law); *Daily News Publishing Co.* v. *Office of Court Administration*, supra, 426 (administrative records pertain to budget, personnel or facilities); *Daily News Publishing Co.* v. *Office of Court Administration*, supra, 427 ("[t]he judiciary, and only the judiciary, has the power to determine

when, and under what conditions, [court records] may be made available").

In the present case, we conclude that, in limiting the act's application to the administrative function of the courts, our legislature intended to codify the principle that courts, not executive agencies, should have control over court records. The New York legislature, like the federal government and many other states,[12] exempted the courts entirely from the state's freedom of information law out of "respect for the independence of the judiciary as a separate coequal branch of government . . . ." *Harvey* v. *Hynes*, supra, 174 Misc. 2d 180. New York courts subsequently recognized, however, that the courts' purely administrative functions and offices, i.e., functions and offices "largely concerned with the staffing and physical operation of the courts, as opposed to [their] adjudicatory functions"; *Quirk* v. *Evans*, supra, 116 Misc. 2d 557; could not be considered judicial functions or offices for freedom of information law purposes. Our legislature simply made that determination in the first instance. Accordingly, we conclude that New York case law provides persuasive guidance as to the scope of our freedom of information statute. We conclude, therefore, that administrative records are records pertaining to budget, personnel, facilities and physical operations of the courts and that records created in the course of carrying out the courts' adjudicatory function are categorically exempt from the provisions of the act.

We emphasize that, in the present case, this determination does not mean that Collins has no right to the information that he requested from the plaintiffs. He may have such a right under the first amendment. See

---

[12] See 37A Am. Jur. 2d 42, Freedom of Information Acts § 14 (1994) ("[t]he federal and many state freedom of information acts do not apply to court records").

*Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597–99, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) (public has general right to inspect and copy public records but courts may exercise supervisory powers to deny access in appropriate cases); *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004) (docket sheets are presumptively open to public and public and press have qualified first amendment right to inspect them); *State* v. *Ross*, 208 Conn. 156, 158, 543 A.2d 284 (1988) (public and press have right of access to court records); *State* v. *Ross*, supra, 159 (noting first amendment interest of public and press in "full access to all aspects of criminal proceedings"); see also Practice Book § 42-49A (a) ("[e]xcept as otherwise provided by law, there shall be a presumption that documents filed with the court shall be available to the public"). It is important to note, however, that the act goes far beyond merely codifying this first amendment right. The act imposes short time deadlines for considering requests for records; see General Statutes § 1-206 (a);[13] provides for appeals to the commission; see General Statutes § 1-206 (b) (1); and provides for the imposition of "a civil penalty of not less than twenty dollars nor more than one thousand dollars" against an official who denies any right created by the act without reasonable grounds. General Statutes § 1-206 (b) (2). We find it highly unlikely that the legislature, which expressly recognized the precarious constitutionality of the act as applied to the judiciary, could have intended these pro-

---

[13] General Statutes § 1-206 (a) provides: "Any denial of the right to inspect or copy records provided for under section 1-210 shall be made to the person requesting such right by the public agency official who has custody or control of the public record, in writing, within four business days of such request, except when the request is determined to be subject to subsections (b) and (c) of section 1-214, in which case such denial shall be made, in writing, within ten business days of such request. Failure to comply with a request to so inspect or copy such public record within the applicable number of business days shall be deemed to be a denial."

visions to apply to records created by judicial officers carrying out essentially judicial functions.

In support of its claim to the contrary, the commission relies on this court's dicta in *Rules Committee of the Superior Court* suggesting that the accounting, personnel, scheduling and record keeping activities of the judicial branch might be administrative functions; see *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 246; and that "jury dockets listing the names of litigants and counsel, the judge to whom each case was assigned and the time and place each case was to be called" might be administrative records subject to the act. Id., 242 n.10. The commission argues that these statements establish that all judicial records relating to the tracking, scheduling and docketing of cases are administrative. We disagree.

First, it is apparent that our decision in *Rules Committee of the Superior Court* was internally inconsistent. As the commission points out, we concluded in that case that the phrase " 'administrative functions' " referred to the "internal institutional machinery" of the court; id., 243; and suggested in dicta that these functions might include the court's record keeping function. Id., 242 n.10. That suggestion was inconsistent, however, with the basic holding of that case that the phrase " 'administrative function,' " which was devoid of "generally accepted plain meaning"; id., 239; must be given a *restrictive* meaning in order to avoid a constitutional confrontation between the legislature and the judiciary; id., 242; and with our rejection of the broad view that administrative functions include "the conduct of the entire official business of the [judicial branch]." Id., 239. Moreover, the suggestion rests on the faulty logic that, because administrative duties may include keeping records, all record keeping activities necessarily are administrative as that term is used in the act.

Second, it is now apparent to us that the phrase "internal institutional machinery"; id., 243; is as devoid of "generally accepted plain meaning" as the phrase " 'administrative functions,' " and, like that phrase, could refer "to a wide range of activities extending from the day to day management of an organization or an estate's internal housekeeping functions to the conduct of the entire official business of the government." Id., 239. Indeed, it is difficult to imagine how any activity, administrative or otherwise, of any governmental entity could be conducted if not through the entity's internal institutional machinery.[14] Accordingly, we do not believe that this phrase, in and of itself, provides any real guidance as to whether a function is administrative.

Third, the testimony before the judiciary committee that we cited in *Rules Committee of the Superior Court*[15] in support of our suggestion that record keeping is an administrative function, was given by a commission representative two years *after* the enactment of

[14] For example, the preparation of trial transcripts reasonably could be characterized as part of the judicial branch's internal institutional machinery for tracking cases. Likewise, the preparation of records of motions and rulings and even records pertaining to the assignment of the writing of appellate opinions to individual judges would be subject to the act. It would also appear that the preparation of records pertaining to the scheduling and tracking of rules committee meetings and the business conducted at them, such as meeting notices, agendas, minutes and draft rules, would be subject to the act, a result that hardly seems consistent with this court's decision in *Rules Committee of the Superior Court.*

[15] We noted in *Rules Committee of the Superior Court* that "[t]he limited scope of the act's intended application to the judiciary is evidenced by the remarks of the [commission's] representative, who testified before the Judiciary Committee in support of the 1977 amendment that, in the one case presented to the [commission] in its first two years of operation involving the Judicial Department, the [commission] had ordered the release of jury dockets listing the names of litigants and counsel, the judge to whom each case was assigned and the time and place each case was to be called. The [commission] representative further testified, 'I think that's a good example of what an . . . [administrative record] of the court is.' Judiciary Committee Proc., Pt. 2, 1977 Sess., p. 548." *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* supra, 192 Conn. 242 n.10.

the act. We recognize that "testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation . . . and, therefore . . . helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003). We do not believe, however, that testimony given two years *after* a statute was enacted can shed light on those questions. The testimony by the commission's representative merely constituted his interpretation of the statute. As we have indicated, an agency's interpretation of a statute is not entitled to any special deference when "the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations." (Internal quotation marks omitted.) *State Medical Society* v. *Board of Examiners in Podiatry*, supra, 208 Conn. 718. Accordingly, we conclude that the representative's testimony provides no persuasive guidance on the scope of the act.

Fourth, the conclusion that not all record keeping is administrative in nature within the meaning of the § 1-200 (1) (A) is supported by the language of the relevant statutory provisions. Reading § 1-200 (1) (A) and (5) together, the act effectively provides that " '[p]ublic records or files' means any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by [any judicial office, official, or body or committee thereof *but only with respect to its or their administrative functions*]."[16] (Emphasis added.) See General Statutes § 1-

---

[16] We did not consider the language of § 1-200 (1) and (5) in *Rules Committee of the Superior Court* because that case involved the act's open meeting provisions, not its public records provisions. It is also important to note that the record keeping that we characterized as an administrative function in that case was performed by the office of the chief court administrator. See *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 244–46 (citing statutes describing duties of

200 (1) and (5). It makes little sense to interpret this provision to mean that the phrase " '[p]ublic records or files' " means any recorded data relating to the conduct of the public's business retained by any judicial office, official, or body or committee thereof in the course of keeping records. Rather, this language clearly indicates that the legislature intended to draw a vertical line between inherently judicial activities, such as adjudicating cases, and inherently administrative activities, such as preparing budgets, and did not intend to draw a horizontal line between the aspects of inherently judicial activities that may have some administrative character, such as keeping records, and the aspects of inherently judicial activities that are purely nonadministrative, whatever those might be. See footnote 14 of this opinion. A conclusion to the contrary would negate the legislature's intent to treat the judicial branch differently from administrative agencies under the act and to circumscribe narrowly the act's applicability to court records.

Finally, our conclusion that record keeping is not an inherently administrative function within the meaning of the act is bolstered by a review of the genealogy of the act and other statutes governing the disclosure of public records. Before the legislature enacted the act in 1975, General Statutes (Rev. to 1975) § 1-19 provided in relevant part: "Except as otherwise provided by any federal or state statute or regulation, all records made, maintained or kept on file by any executive, administrative, legislative or *judicial body*, agency, commission or official of the state, or any political subdivision thereof, whether or not such records are required by any law

office of chief court administrator and characterizing office's record keeping duties as administrative tasks). It may be that records pertaining to individual cases kept by that office for the purpose of allocating personnel or preparing budgets could be considered administrative records. It does not follow, however, that records kept by the clerk of the Superior Court for the purpose of facilitating the adjudication of cases are administrative records.

or by any rule or regulation, shall be public records and every resident of the state shall have the right to inspect or copy such records at such reasonable time as may be determined by the custodian thereof. . . ." (Emphasis added.) When the legislature enacted the freedom of information act in 1975, it exempted the constitutional courts and the nonadministrative functions of the Court of Common Pleas in recognition of the fact that subjecting the courts to the powers of an executive agency would be of dubious constitutionality. See *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* supra, 192 Conn. 240–41. The legislature also provided, however, that "[n]othing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be . . . deemed in any manner to affect the status of judicial records as they existed prior to October 1, 1975 . . . ." General Statutes (Rev. to 1977) § 1-19b (3); see also General Statutes § 1-213 (b) (1) ("[n]othing in the Freedom of Information Act shall be deemed in any manner to . . . [a]ffect the status of judicial records as they existed prior to October 1, 1975"). We cannot perceive why the legislature would have taken pains to express its view that nothing in the act should affect the status of judicial records after the effective date of the act if it intended that such records would be subject to the act.

The commission also relies on our decision in *Connecticut Bar Examining Committee* v. *Freedom of Information Commission,* supra, 209 Conn. 208, in support of its position that the scheduling and docketing of cases is an administrative function. In that case, the defendant commission ordered the plaintiffs, the bar examining committee (committee) and its director, to provide the defendant, William J. Corvo, with copies of certain records pertaining to the bar examination given in July, 1983.[17] Id., 205. The committee appealed

---

[17] The records included "a list of the persons who read, scored or graded the essay answers; a list of all independent readers used by the committee

to the Superior Court, which sustained the appeal on the ground that the committee does not perform " 'administrative functions' " within the meaning of the act. Id. The commission then appealed from the judgment of the trial court to this court. Id., 206.

On appeal, we agreed with the committee that "its principal function of determining whether an applicant is qualified for admission to the bar is quite analogous to adjudication." Id., 209. We also stated, however, that "[w]e have recognized that certain duties performed by judicial officers, such as accounting, personnel scheduling and record keeping, some of which are detailed in General Statutes § 51-5a, are administrative tasks. [*Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn.] 244–46. It follows that any records relating to the performance of such duties must be made available pursuant to [General Statutes] § 1-19 [now codified at § 1-210 (a)], unless doing so would in some manner interfere with the performance of judicial functions." *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, supra, 209 Conn. 208. We concluded, therefore, that "[i]t is not at all clear . . . that all of the records generated in [the committee's] adjudicative

for such examination; a list of readers, graders or scorers for each of the twelve essay questions; the criteria used to determine the competency of the committee's examiners, readers and scorers; the review procedure used to determine the competency of examiners; the standard deviation of both Part A and Part B scores; the average of Part A and Part B scores; guidelines as to conditions under which the bar examination answers may be graded; names of individuals who select examiners for the bar examination; names of the monitors of the examination; the criteria for determining that the number 264 qualifies an individual to practice law in the state of Connecticut; the purpose and meaning of that number as established in any rules or guidelines which the bar examining committee may have promulgated; and the criteria for using the numbers 254 and 274 as numbers which automatically require a rereading of essay answers by an independent reader." *Connecticut Bar Examining Committee* v. *Freedom of Information Committee*, supra, 209 Conn. 207.

process are wholly unrelated to the internal management of the court system or that all of them must be withheld from public view to avoid interference with that process." Id., 209–10. Rather, "[s]ome aspects of [the] adjudicative process . . . may properly be classified as administrative." Id., 210.

We then held that the process of "establishing the criteria to be used for [the determination of whether an applicant is qualified for admission to the bar] . . . selecting the questions for the examination and deciding upon its scope . . . grading the examinations, and . . . establishing procedures designed to reduce the effect of subjectivity on the part of the examiners," and the application of those standards to particular candidates, were analogous to adjudication and, therefore, records relating to those activities were exempt from the act. Id., 209–10. We also held that "the promulgation of those criteria, like the publication of the rules of practice," and "the compilation of scores on the examinations in a manner similar to the preservation of records of judicial proceedings in the clerk's office," were administrative functions and, therefore, were subject to the act. Id., 210. Because the trial court had not considered whether providing public access to the records subject to the act would impede significantly the committee's performance of its judicial function, we remanded the case to that court for a hearing on that issue. Id., 211.

The commission argues that our decision in *Connecticut Bar Examining Committee* supports its position that judicial records that are both adjudicative and administrative are subject to the act. We concluded in that case, however, that "[t]he application of the standards for admission to a particular candidate . . . is a function . . . that must be regarded as essentially judicial"; id., 210; and, therefore, that records pertaining to that function were exempt. Id., 210–11. It seems clear,

therefore, that a request for the names, addresses, dates of birth and status of the pending applications of all applicants to the bar for a particular period would not be covered by the act. If the application of bar admission criteria to an individual applicant is not an administrative function then, a fortiori, the adjudication of individual criminal cases is not an administrative function and records created for the purpose of carrying out that function are not subject to the act. Such records are not like records promulgating the criteria for admission to the bar or the rules of practice, or compiling the results of the bar examination, which are created for the very purpose of sharing information with the public at large. Rather, the keeping of records for the purpose of scheduling and tracking individual cases and parties is an activity undertaken by the courts for the primary purpose of facilitating their ability to carry out their core judicial function. If such records were treated as public records subject to the act, then no judicial records would be exempt.

To the extent that *Connecticut Bar Examining Committee* held that the act applies to judicial functions that are both administrative and adjudicative, the case relied exclusively on our dicta in *Rules Committee of the Superior Court* in support of that proposition; see id., 210; and is subject to criticism for the same reasons. Moreover, *Connecticut Bar Examining Committee* highlights the inherent unworkability of the rule suggested by our dicta in the earlier case. For example, we concluded in *Connecticut Bar Examining Committee* that the application of the bar admission criteria to particular candidates was an adjudicative function and was exempt from the act, while the compilation of scores on the examination "in a manner similar to the preservation of records of judicial proceedings in the clerk's office"; id.; was an administrative function. The scoring of examinations, however, *is* the application

of bar admission criteria to particular candidates. The opinion does not attempt to explain at what point in the process the recording of scores ceases to be an adjudicative function and becomes an administrative function. To the extent that the opinion merely held that compiling a list of scores for the purpose of publication is an administrative function; see id. (noting "obvious distinction between . . . determining whether applicants have satisfied the requirements for admission to the practice of law and . . . announcing the results of its deliberations" to general public); it is far from clear whether the clerk's office engages in any analogous activity with respect to judicial proceedings. In any event, applying the act to this function would appear to be redundant. Finally, as we have suggested, a conclusion that judicial records that have both an administrative and an adjudicative function are subject to the act would effectively mean that *all* judicial records are subject to the act, a conclusion that cannot be reconciled with the legislative desire to restrict the application of the act to the judiciary. Accordingly, we conclude that this court's decision in *Connecticut Bar Examining Committee* does not support the commission's position.

It is essential for the independence of the judicial branch that the courts have control over court records and that the other branches of government not interfere with that control. The right to control includes the right to determine, consistent with the first amendment right to access, the time, place, manner and format in which court records are maintained and disclosed. These basic principles were recognized by the legislature when it limited the application of the act to the courts' administrative function and by this court when we recognized that the term administrative as used in the act must be given a "restrictive reading" in order to advance the legislature's desire to preserve the delicate balance of

power between the separate branches. *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 242. In light of that legislative intent and our duty to construe statutes to avoid potential constitutional infirmity, we conclude that, for the purposes of the act, the judicial branch's administrative functions consist of activities relating to its budget, personnel, facilities and physical operations and that records unrelated to those activities are exempt.

The computer records at issue in the present case do not relate to any of these activities. Accordingly, we conclude that the records were not subject to the act.

The judgment is affirmed.

In this opinion PALMER, ZARELLA and LAVERY, Js., concurred.

PALMER, J., concurring. I join the opinion of the majority. I write separately only to underscore the fact that the majority's conclusion that the documents sought by Russell Collins fall outside the definition of "administrative functions" of the judicial branch for purposes of the Freedom of Information Act (act), General Statutes § 1-200 (1),[1] does not mean that Collins is not entitled to inspect and copy those documents. On the contrary, Collins has a presumptive right of access to those documents—and to all other documents in the possession of the court that relate to its adjudicative function. I agree with the majority, however, that the legislature did not intend to place the judicial branch under the supervision of the defendant, the freedom of

---

[1] General Statutes § 1-200 provides in relevant part: "(1) 'Public agency' or 'agency' means:

"(A) Any executive, administrative or legislative office of the state or any political subdivision of the state . . . and also includes any judicial office, official, or body or committee thereof but only with respect to its or their administrative functions . . . ."

information commission (commission), for purposes of ensuring that the judiciary discharges it responsibility to make such documents available to the public.

As this court recently has observed, "the public has a real and legitimate interest in the workings of our courts, and vindication of that interest requires, as a general matter, that the courts' business not be conducted covertly." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 223, 884 A.2d 981 (2005). Consequently, the public has a presumptive right of access to court proceedings and documents. E.g., id., 216. This right of access, which pertains both to criminal proceedings; see, e.g., *State* v. *Ross*, 208 Conn. 156, 158–59, 543 A.2d 284 (1988); and to civil proceedings; see, e.g., *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 216–17; traces its roots to the first amendment; see, e.g., *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 91–93 (2d Cir. 2004); and to the common law. See, e.g., *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597–98, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978). Indeed, the public's presumptive right of access to court proceedings and documents is embodied in our rules of practice. Practice Book § 11-20A, which pertains to civil proceedings, and Practice Book § 42-49A, which pertains to criminal proceedings, provide, "in general terms, that the . . . records of court proceedings may not be sealed, unless the court identifies, on the record and in open court, 'an interest which is determined to override the public's interest . . . in viewing such materials.' " *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 67–68, 818 A.2d 14 (2003). Because this public right of access to court documents pertains to *all* such documents,[2] the

---

[2] As I noted previously in the text of this opinion, the public right of access to court documents is not absolute, and, therefore, upon appropriate findings, a court may order the sealing of a document or documents. See Practice Book §§ 11-20A and 42-49A. Of course, under any construction of § 1-200 (1), including the construction advanced by the dissent, documents sealed according to law would not be available for public inspection.

right encompasses not only the category of materials that Collins seeks in the present case but also all other documents in the possession of the court that pertain to its adjudicative function.

When the legislature passed the act in 1975 and included within its purview the "administrative functions" of the judicial branch; see Public Acts 1975, No. 75-342, § 1; the legislature was aware that placing the judicial branch within the scope of the act would give rise to "extraordinarily sensitive issues surrounding the delicate balance among the coordinate branches of our state government." *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 240, 472 A.2d 9 (1984). In accordance with the delicate nature of its undertaking, the legislature sought to avoid any possibility of a conflict with the judicial branch by severely curtailing the scope of the act as applied to the judiciary. Thus, as this court explained in *Rules Committee of the Superior Court*, the limited applicability of the act to the judicial branch reflects the "legislative concern for the independence of the judiciary and a legislative intent to avoid a collision with the prerogatives of the constitutional courts." Id.; see also *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, 209 Conn. 204, 210–11, 550 A.2d 633 (1988) ("[w]e have construed the limitation to 'administrative functions' of the public disclosure provisions of the [act] as applied to the judicial [branch] to be designed to accommodate, rather than infringe upon, the independence of a constitutional court in performing its historic functions"). Consistent with that legislative concern, the term "administrative functions" is to be given a restrictive interpretation. See *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 242.

In 1975, the legislature undoubtedly also was aware of the fact that all documents relating to the adjudicatory

function of the courts, in contrast to documents pertaining exclusively to the courts' administrative functions, were presumptively available for inspection and copying by the public. See, e.g., *Nixon* v. *Warner Communications, Inc.*, supra, 435 U.S. 597 ("[i]t is clear that the courts of this country recognize a general right to inspect and copy . . . judicial records and documents"). It therefore is reasonable to presume that the legislature, in limiting the applicability of the act to the "administrative functions" of the judicial branch, sought to ensure that the public also had access to those documents in the possession of the judicial branch that were not *already* subject to disclosure, namely, those documents that related exclusively to the courts' administrative functions.

In light of the "extraordinarily sensitive issues" that are implicated by extending the act to the judicial branch; *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 240; and because of our courts' preexisting responsibility to provide the public with access to court documents that relate to the judiciary's adjudicative function, I do not believe that the legislature intended to make the judicial branch answerable to the commission concerning the manner in which compliance with requests for such documents is to be achieved. To conclude otherwise would be to minimize the legislature's acknowledged concern for the independence of the judiciary as a coordinate branch of government. Although there can be no doubt that Collins has a presumptive right to inspect and copy the documents he seeks, under the statutory scheme that the legislature has adopted, the judiciary, and not the commission, ultimately is responsible for determining—consistent with the important public right of access to court documents—how best to comply with Collins' request.

NORCOTT, J., with whom BORDEN and KATZ, Js., join, dissenting. I disagree with the majority's conclusion that "the judicial branch's administrative functions consist of activities relating to its budget, personnel, facilities and physical operations and that records unrelated to those activities are exempt" from the scope of the Freedom of Information Act (act), specifically General Statutes §§ 1-200 (1) (A),[1] 1-210 (a)[2] and 1-200 (5).[3] The majority then applies this improperly restrictive definition to affirm the judgment of the trial court,

---

[1] General Statutes § 1-200 (1) provides in relevant part: " 'Public agency' or 'agency' means:

"(A) Any executive, administrative or legislative office of the state or any political subdivision of the state . . . and also includes any judicial office, official, or body or committee thereof but only with respect to its or their administrative functions . . . ."

[2] General Statutes § 1-210 (a) provides: "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. Any agency rule or regulation, or part thereof, that conflicts with the provisions of this subsection or diminishes or curtails in any way the rights granted by this subsection shall be void. Each such agency shall keep and maintain all public records in its custody at its regular office or place of business in an accessible place and, if there is no such office or place of business, the public records pertaining to such agency shall be kept in the office of the clerk of the political subdivision in which such public agency is located or of the Secretary of the State, as the case may be. Any certified record hereunder attested as a true copy by the clerk, chief or deputy of such agency or by such other person designated or empowered by law to so act, shall be competent evidence in any court of this state of the facts contained therein. Each such agency shall make, keep and maintain a record of the proceedings of its meetings."

[3] General Statutes § 1-200 (5) provides: " 'Public records or files' means any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency, or to which a public agency is entitled to receive a copy by law or contract under section 1-218, whether such data or information be handwritten, typed, tape-recorded, printed, photostated, photographed or recorded by any other method."

concluding that records kept in the criminal/motor vehicle computer system (computer system) by the plaintiffs, the clerk of the Superior Court, geographical area number seven (clerk), and the state judicial branch (judicial branch), are not "administrative" records that are subject to disclosure under the act, as ordered by the defendant, the freedom of information commission (commission), pursuant to a request filed by an attorney, Russell Collins. Because the majority's flawed definition is the product of its miscomprehension of our case law, misplaced reliance on New York law, and failure to credit properly the legislative history of the act, I respectfully dissent.

## I

I begin by noting my agreement with the undisputed facts and procedural history as described in the majority opinion, as well as the standard of review stated therein. I do, however, have serious misgivings about the majority's analysis of the primary issue on this appeal, namely, whether the computer system records are subject to disclosure under the act, which provides in relevant part that "any judicial office, official, or body or committee thereof" is a " '[p]ublic agency' " subject to the act, "but only with respect to its or their administrative functions . . . ." General Statutes § 1-200 (1) (A). Although the act does not define the term "administrative functions," this court explained in *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 243, 472 A.2d 9 (1984), that they are matters that "relat[e] to the management of the internal institutional machinery of the court system." (Internal quotation marks omitted.) I believe that this court's subsequent decision in *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, 209 Conn. 204, 550 A.2d 633 (1988), provides helpful elaboration on which matters "relat[e] to the management of the internal institutional machinery of the court

system"; *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 243; and that the majority does not give that case its due regard. Before turning, however, to *Connecticut Bar Examining Committee*, it is instructive to explore the genesis of the "internal institutional machinery" standard.

In *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 235–37, a citizen had requested, and had been denied, notice of and access to all meetings of the rules committee of the Superior Court (rules committee), which is the body that considers and suggests proposed changes to the rules of practice. The trial court sustained the rules committee's administrative appeal from the decision of the commission concluding that the "[r]ules [c]ommittee performed an administrative function within the [j]udicial [d]epartment," and ordering the rules committee to admit the citizen to its meetings. Id., 238.

This court affirmed the decision of the trial court, concluding that the rules committee's activities were outside the scope of the act. Id., 239. The court stated that, the "central issue before us is the proper construction of 'administrative function' . . . since it is undisputed that the [act] itself applies, with respect to the [j]udicial [d]epartment, only to officials or bodies who perform administrative functions." Id. At the outset, the court noted the ambiguity of the term " 'administrative,' " as well as the lack of a "sharp line of demarcation . . . between activities which are adjudicatory and those which are administrative." Id. The court also emphasized, in the context of applying the act to the courts, "the extraordinarily sensitive issues surrounding the delicate balance among the coordinate branches of our state government." Id., 240.

The court first stated that the legislative history of the act, while "provid[ing] little guidance for construc-

tion of the 'administrative functions' of the [j]udicial [d]epartment . . . does, nevertheless, reveal a legislative concern for the independence of the judiciary and a legislative intent to avoid a collision with the prerogatives of the constitutional courts."[4] Id. The court concluded that "[a]n interpretation of 'administrative functions' that excludes the judicial rule-making power is consistent with the analytic distinctions developed by scholarly commentators." Id., 242. It stated that, "[i]t is the distinction between procedural and administrative rules that is at issue in this case. That distinction turns upon whether we are dealing with matters involved in the adjudication of cases, which are procedural, or with matters involved in the internal organization of large and complex systems of courts, which are administrative." Id. The court held that, "[f]ollowing this analytic model, we believe it is appropriate to confine 'administrative functions' . . . to matters relating to the management of the internal institutional machinery of the court system." Id., 242–43.

The court then provided some explanation of the concept of the "internal institutional machinery of the court system." (Internal quotation marks omitted.) Id., 243. The court cited *Adams* v. *Rubinow*, 157 Conn. 150, 160, 251 A.2d 49 (1968), and stated that, in *Adams*, "[i]n rejecting the . . . probate judges' claim that [a statute

---

[4] The court stated that when the act was "first enacted in 1975, the reach of the [act] within the [j]udicial [d]epartment was limited to the [administrative functions] of the inferior courts established by the legislature; it did not apply to the constitutional courts at all." *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 240. A proponent of the act explained that the reason that this court and the Superior Court "were not included [in 1975] is that there is a grave constitutional problem in legislative rule-making for constitutional courts." (Internal quotation marks omitted.) Id., 241. The constitutional courts were included in the scope of the act in 1977, "at least partly in response to the merger of the Superior Court with the Court of Common Pleas," although the applicability of the act remained "limited . . . to the undefined 'administrative functions' of the [j]udicial [d]epartment." Id.

providing for the appointment of a judge of the Superior Court to act as administrator of the unified Probate Court system] encroached on their inherent judicial authority to manage the affairs of their courts, we emphasized the limited responsibilities of the administrator, which 'concerned [only the] . . . efficient administrative, accounting and record-keeping procedures to be followed in the Probate Court . . . .' " *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* supra, 192 Conn. 243. The court stated that the statutes describing the "duties of the chief court administrator and the executive secretary, respectively, provide further examples of administrative tasks. Those statutes speak mainly to the accounting, personnel, scheduling and record-keeping activities of the [j]udicial [d]epartment. They do not purport to extend delegation of legislative authority to the rules of practice."[5] Id., 245–46. The court noted that the "[r]ules [c]ommittee . . . plays no role in the management of the internal institutional machinery of the court system. It is charged, instead, with the responsibility of formulating rules of practice and procedure that directly control the conduct of litigation. It sets the parameters of the adjudicative process that regulates the interactions between individual litigants and

---

[5] I note, however, that some of the administrative duties set forth in these statutes, General Statutes §§ 51-5a and 51-9, relate specifically to caseload management. See, e.g., General Statutes § 51-5a (a) (1) (chief court administrator "shall be responsible for the efficient operation of the department, the prompt disposition of cases and the prompt and proper administration of judicial business"); General Statutes § 51-9 (7) (executive secretary shall "[e]xamine the state of the dockets of the courts of the [j]udicial [d]epartment to ascertain the need for assistance by any court and to implement programs for the fair and prompt disposition of cases therein"); General Statutes § 51-9 (17) (executive secretary shall "[d]esign, implement and maintain . . . computerized automatic data processing systems for use in the Supreme Court, Appellate Court and Superior Court or divisions of the Superior Court"); General Statutes § 51-9 (18) (executive secretary shall "[s]upervise administrative methods employed in clerks' offices and in the various offices of the Supreme Court, Appellate Court and Superior Court").

the courts. Accordingly, we hold that the [r]ules [c]ommittee does not perform 'administrative functions' . . . and is not subject to the provisions of the [act]." Id., 246.

Several years later, this court discussed the "internal institutional machinery" standard in *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, supra, 209 Conn. 204, wherein we considered an appeal by the commission from a judgment of the trial court sustaining an appeal by the bar examining committee (examining committee) from an order of disclosure by the commission. That order of disclosure was far-reaching. It required the examining committee to disclose "the following information pertaining to the bar examination given on July 27 and July 28, 1983: a list of the persons who read, scored or graded the essay answers; a list of all independent readers used by the [examining] committee for such examination; a list of readers, graders or scorers for each of the twelve essay questions; the criteria used to determine the competency of the [examining] committee's examiners, readers and scorers; the review procedure used to determine the competency of examiners; the standard deviation of both Part A and Part B scores; the average of Part A and Part B scores; guidelines as to conditions under which the bar examination answers may be graded; names of individuals who select examiners for the bar examination; names of the monitors of the examination; the criteria for determining that the number 264 qualifies an individual to practice law in the state of Connecticut; the purpose and meaning of that number as established in any rules or guidelines which the bar examining committee may have promulgated; and the criteria for using the numbers 254 and 274 as numbers which automatically require a rereading of essay answers by an independent reader." Id., 207.

The court concluded that, "in selecting candidates for admission to the bar the [examining] committee is

acting as an arm of the judiciary, but that in such a role some of its functions are administrative and . . . its records that relate solely to those functions must be made available to the public pursuant to [§ 1-210]." Id., 206. Accordingly, this court remanded the case "for further proceedings in the trial court to determine (1) which portions of the information [that] the [commission] has ordered to be disclosed concern only the performance of the [examining] committee's administrative functions, and (2) whether public access to the pertinent records may interfere with the performance of the [examining] committee's judicial functions." Id.

In so concluding, this court determined that, although the examining committee's task of determining whether an applicant is qualified for admission to the bar is analogous to adjudication, "[i]t is not at all clear . . . that all of the records generated in this adjudicative process are wholly unrelated to the internal management of the court system or that all of them must be withheld from public view to avoid interference with that process. *For example, the duty of the [examining] committee set forth in Practice Book § [2-9] to certify to the clerks of the Superior Court in each county the names of the successful applicants to the bar can hardly be classified as adjudicative.*" (Emphasis added.) Id., 209–10.

This court also stated that "[t]here is an obvious distinction between the functions of the [examining] committee in determining whether applicants have satisfied the requirements for admission to the practice of law and in announcing the results of its deliberations. The role of the [examining] committee in establishing the criteria for determining the qualifications of applicants is similar to that of the rules committee of the Superior Court in formulating rules of procedure for adoption by the judges, a role that we have held is a judicial function within the meaning of § [1-200]. *Rules*

*Committee of the Superior Court* v. *Freedom of Information Commission,* supra, [192 Conn.] 246. *Nevertheless, the promulgation of those criteria, like the publication of the rules of practice, plainly is an administrative matter.* The application of the standards for admission to a particular candidate, however, like the application of the law to the facts of a case, is a function of the [examining] committee that must be regarded as essentially judicial. *Some aspects of this adjudicative process, however, such as the compilation of scores on the examinations in a manner similar to the preservation of records of judicial proceedings in the clerk's office, may properly be classified as administrative."* (Emphasis added.) *Connecticut Bar Examining Committee* v. *Freedom of Information Commission,* supra, 209 Conn. 210.

In my view, the reasoning in *Connecticut Bar Examining Committee* demonstrates that "records generated in [the] adjudicative process" may be related entirely "to the internal management of the court system," and, therefore, properly classified as administrative under the act.[6] Id. Put differently, a record may be administrative, and, therefore, subject to the act, even if it emerges from the process of deciding cases. See id. (noting that *"aspects* of [the] *adjudicative* process . . . may properly be classified as *administrative"* [emphasis added]); see also id. (comparing "the compilation of

---

[6] I note briefly the plaintiffs' reliance on *Fromer* v. *Freedom of Information Commission,* 43 Conn. Sup. 246, 649 A.2d 542 (1993), aff'd, 36 Conn. App. 155, 649 A.2d 540 (1994). In *Fromer,* the trial court determined that the commission had lacked jurisdiction over the official court monitor's tapes from a pending case because "the tape recordings of court proceedings are involved in the adjudication of cases and not in the management of the internal institutional machinery of the court system, and, therefore, are appropriately determined to be 'nonadministrative.' " Id., 251. I consider *Fromer,* like the present case, to be limited to its facts, and, in any event, neither binding on us nor dispositive of the present case. See id., 252 ("this is a case limited solely to whether the commission correctly concluded that it had no jurisdiction to decide the plaintiff's complaint").

scores on the [bar] examinations . . . *to the preservation of records of judicial proceedings in the clerk's office*" and classifying *both* as "*administrative*" [emphasis added]).

I would, therefore, conclude that the computer system information in the present case pertains merely to the "internal institutional machinery" by which the judicial branch schedules and tracks pending criminal cases, and is not information affecting the decisional process in those cases, which is exempt from the act.[7] Under the reasoning of *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, supra, 209 Conn. 210, the computer system information, which does not include records such as pleadings, briefs or memoranda of decision, is more closely analogous to the *promulgated* qualifications criteria or the *published* rules of practice. These are tasks that this court concluded were administrative in nature, as contrasted with the deliberative process of determining and applying the specific qualifications criteria or rules of practice, which we considered adjudicatory.[8] Accord-

---

[7] Moreover, as the commission points out, my conclusion that the computer system records are "administrative" finds further support in chapter 7 of the Practice Book, which prescribes the court clerks' administrative duties with respect to caseflow management. See, e.g., Practice Book § 7-1 ("[t]he clerk shall keep a record of all pending cases, including applications and petitions made to the court, together with a record of each paper filed and order made or judgment rendered therein, with the date of such filing, making or rendition"); Practice Book § 7-2 (clerk's general duties including record keeping, issuing executions on judgments and receipt of fines and forfeitures); Practice Book § 7-3 (accounting of receipts and disbursements); Practice Book § 7-4 (requiring clerk to keep "daybooks in which to enter each case on the date upon which the matter is filed on a docket of the court location").

[8] I discuss briefly the majority's flawed treatment of *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, supra, 209 Conn. 204. The majority, quoting the court's statement in that case that, "the application of the standards for admission . . . to a particular candidate . . . is a function . . . that must be regarded as essentially judicial"; id., 210; states that "[i]t seems clear, therefore, that a request for the names, addresses, dates of birth and status of the pending applications of all appli-

ingly, I would hold that the trial court improperly concluded that the computer system records in the present case are not administrative records within the meaning of § 1-200 (1) (A).

My conclusion that this case is controlled by *Connecticut Bar Examining Committee* is not swayed by several New York trial court cases that the majority considers illustrative of the difference between administrative and adjudicative functions. See, e.g., *Daily News Publishing Co.* v. *Office of Court Administration*, 186 Misc. 2d 424, 425–26, 718 N.Y.S.2d 800 (2000) (criminal court case records stored in computer database "wherever located" are not subject to freedom of information law because that law does not apply to state's courts); *Quirk* v. *Evans*, 116 Misc. 2d 554, 559, 455 N.Y.S.2d 918 (1982) (office of court administration is not "court," but rather "agency" subject to freedom of information law). These cases lack persuasive authority because both New York's court system and freedom of information statutes are structured differently than those of Connecticut. In New York, the state and local courts are completely exempt from that state's freedom

cants to the bar for a particular period would not be covered by the act. If the application of bar admission criteria to an individual applicant is not an administrative function then, a fortiori, the adjudication of individual criminal cases is not an administrative function and records created for the purpose of carrying out that function are not subject to the act." The majority then explains that such records are, therefore, exempt from the act because "the keeping of records for the purpose of scheduling and tracking individual cases and parties is an activity undertaken by the courts for the primary purpose of facilitating their ability to carry out their core judicial function."

I agree with the majority's conclusion that records such as a list of the bar examination takers are, indeed, analogous to the computer records at issue herein. I part company from the majority because records such as a list of the examination takers do not involve the actual application of the testing criteria. Thus, although the list described by the majority would be subject to the act, the actual score and comment forms used by graders in the evaluation of a particular candidate's examination would be exempt as "adjudicative" documents similar to, for example, a pleading, a law clerk's memorandum to a judge, or a draft opinion.

of information law, but the office of court administration, which "is not itself a court, but rather the courts' own support office" has been held subject to it. *Daily News Publishing Co.* v. *Office of Court Administration,* supra, 426. Accordingly, although New York's office of court administration performs functions such as personnel, facilities and budgeting that are similar to those of Connecticut's chief court administrator, that office of court administration remains organizationally separate from the courts themselves, which are not "agencies" subject to the freedom of information law. See *Babigian* v. *Evans,* 104 Misc. 2d 140, 142, 427 N.Y.S.2d 688 (1980) (rejecting office of court administration's argument that it was exempt "court" rather than subject "agency," because office "does not exercise a judicial function, conduct civil or criminal trials, or determine pretrial motions").[9]

Thus, New York's distinct organizational structure renders that state's cases wholly unpersuasive illustrations of the line between administrative and adjudicative functions that exist under Connecticut's act as applied to our court system. Had our legislature wished to do so, it could have used language limiting the applicability of the act to the office of the chief court administrator or to the judicial branch's nonjudicial business, rather than to the "administrative functions" of the judicial branch.[10] General Statutes § 1-200 (1) (A). Because

---

[9] Only "agencies" are subject to New York's freedom of information law. N.Y. Pub. Off. Law § 87 (McKinney 1988). Under that law, an " '[a]gency' " is "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the *judiciary* or the state legislature." (Emphasis added.) N.Y. Pub. Off. Law § 86 (3) (McKinney 1988). The " '[j]udiciary' " is then defined as "the courts of the state, including any municipal or district court, whether or not of record." N.Y. Pub. Off. Law § 86 (1) (McKinney 1988).

[10] I also must address the majority's contention that reading together subdivisions (1) and (5) of § 1-200; see footnotes 1 and 3 of this dissenting opinion; yields the conclusion that, although all records are administrative by

our legislature did not so act in this case, I would not go down the majority's road of supplying limiting language that the legislature reasonably might have omitted intentionally, particularly when other statutes demonstrate clearly that it knows how to use such specific language. See General Statutes § 51-5a (powers and duties of chief court administrator);[11] General Statutes § 51-8 (a) (establishing office of executive secretary "for the administration of the nonjudicial business of the Judicial Department under the direction of the Chief Court Administrator");[12] see also *Ventres* v. *Goodspeed*

their very nature, not all records necessarily emerge from an "administrative function" of the judicial branch. I view this position as a combination of both stating the obvious and shedding no light on the core question in this case, namely, what an "administrative" function is.

[11] General Statutes § 51-5a provides: "(a) The Chief Court Administrator: (1) Shall be the administrative director of the Judicial Department and shall be responsible for the efficient operation of the department, the prompt disposition of cases and the prompt and proper administration of judicial business; (2) shall meet periodically at such places and times as he may designate with any judge, judges, or committee of judges, and with the Probate Court Administrator to transact such business as is necessary to insure the efficient administration of the Judicial Department; (3) may issue such orders, require such reports and appoint other judges to such positions to perform such duties, as he deems necessary to carry out his responsibilities; (4) may assign, reassign and modify assignments of the judges of the Superior Court to any division or part of the Superior Court and may order the transfer of actions under sections 51-347a and 51-347b; and (5) may provide for the convening of conferences of the judges of the several courts, or any of them, and of such members of the bar as he may determine, for the consideration of matters relating to judicial business, the improvement of the judicial system and the effective administration of justice in this state.

"(b) The Chief Court Administrator may establish reasonable fees for conducting searches of court records. No federal, state or municipal agency shall be required to pay any such fee."

[12] General Statutes § 51-8 provides: "(a) There shall be an office for the administration of the nonjudicial business of the Judicial Department under the direction of the Chief Court Administrator.

"(b) The Chief Court Administrator shall appoint an executive secretary, who shall hold office at the pleasure of the Chief Court Administrator. The salary of the executive secretary shall be fixed by the Supreme Court. The executive secretary shall be a member of the bar of the state and shall not engage in the private practice of law."

*Airport, LLC,* 275 Conn. 105, 160, 881 A.2d 937 (2005) ("[w]e are not permitted to supply statutory language that the legislature may have chosen to omit" [internal quotation marks omitted]), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006).

Moreover, while seeking to divine the legislature's intent as to the meaning of the ambiguous phrase "administrative functions," the majority gives inappropriately short shrift to the act's legislative history, which this court acknowledged in footnote 10 of *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* supra, 192 Conn. 242 n.10. I note that the commission cites that footnote in support of its contention that this court has considered jury dockets listing the names of litigants and counsel, the assigned judge, and the time and place of hearings to be records that are "administrative" in nature. In that footnote, the court discussed the legislative history of the 1977 amendment expanding the act's application to all courts, following the merger of the Court of Common Pleas with the Superior Court as follows: "The limited scope of the act's intended application to the judiciary is evidenced by the remarks of the [commission's] representative, who testified before the [j]udiciary [c]ommittee in support of the 1977 amendment that, in the one case presented to the [commission] in its first two years of operation involving the [j]udicial [d]epartment, the [commission] had ordered the release of jury dockets listing the names of litigants and counsel, the judge to whom each case was assigned and the time and place each case was to be called. The [commission] representative further testified, 'I think that's a good example of what an . . . [administrative record] of the court is.' " Id., quoting Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1977 Sess., p. 548, remarks of Cliff Leonhardt, deputy secretary of the state.

Although this testimony is not a statement of a member of the legislature, and the record of the judiciary

committee proceedings reveals no response to it from any legislator, it nevertheless is helpful to the extent that it demonstrates, at the very least, this court's tacit understanding in *Rules Committee of the Superior Court* of the breadth of the term "administrative," as well as the parameters of the debate before the legislature. See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003) ("testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation . . . because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question" [internal quotation marks omitted]).[13]

The majority's entirely new definition of "administrative functions" is, then, drawn primarily from New York trial court cases interpreting an entirely different statutory scheme from ours. Moreover, the majority's new definition functionally overrules the definition that *this court*—not a New York trial court—has fashioned and applied in both of our precedents to date. Thus, the majority has emasculated the act's application to the judiciary so that it applies only to those records of the judiciary that the public would be least interested in.[14]

---

[13] Indeed, I also must note my disagreement with the majority's characterization of this judiciary committee testimony as unpersuasive because it was given two years after the original enactment of the act in 1975. On the contrary, the timing of this testimony makes it particularly persuasive because it was offered in support of the 1977 bill that expanded the applicability of the act to the "administrative functions" of the constitutional courts after the merger of the Court of Common Pleas with the Superior Court. Prior to 1977, this simply was not an issue because the act did not apply to the constitutional courts.

[14] I believe, and the majority appears to agree, that much of the material at issue here would be disclosable to the public under traditional constitutional principles of access to judicial records. See, e.g., *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004); see also *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597–98, 98 S. Ct. 1306, 55 L. Ed. 2d

This has been done, moreover, without a shred of evidence, either from the legislative language, history or purpose, that that is what the legislature intended.

I, therefore, find the majority's analysis highly unpersuasive and, accordingly, I reject its adoption of a bright line rule that "administrative records are records pertaining to budget, personnel, facilities and physical operations of the courts and that records created in the course of carrying out the courts' adjudicatory function are categorically exempt from the provisions on the act."[15] Indeed, if the legislature had intended the bright line demarcation that the majority endorses, it would hardly have drawn such an elastic and ambiguous phrase as "administrative functions." Accordingly, I see no reason not to continue making the administrative/adjudicative determination on a case-by-case basis, and

570 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records," but that the common-law "right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."). I do, however, have grave reservations about the result of the majority's decision, and its new, highly restrictive definition of "administrative function," namely, that a member of the public who is wrongfully deprived of such access will be forced to hire an attorney and bring a plenary lawsuit—with its attendant expense and delay—rather than employ the administrative machinery of the commission, which was instituted to guarantee the notion of freedom of access to public records.

[15] In questioning the utility of the "internal institutional machinery" standard, the majority expresses concern that other judicial documents might also be considered administrative under that standard, namely, records pertaining to the preparation of trial transcripts, motions and ruling thereon, and "even records pertaining to the assignment of the writing of appellate opinions to individual judges . . . ." I emphasize that the present appeal is confined only to the status of the computer system records at issue herein, and that I express no opinion as to the availability or lack thereof under the act of other judicial records, which may well turn on provisions of the act not presently before us. See, e.g., General Statutes § 1-210 (b) (1) ("[n]othing in the Freedom of Information Act shall be construed to require disclosure of . . . [p]reliminary drafts or notes provided the public agency has determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure").

I can find no reason under the "internal institutional machinery" standard set forth in *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 243, to exempt a record from the purview of the act solely because it is in some way related to the mechanisms by which the judicial branch processes cases. I would, therefore, reverse the judgment of the trial court.

## II

Because I would reverse the judgment of the trial court, I must address the plaintiffs' claim, posited as an alternate ground for affirmance, that the trial court properly concluded that the judicial branch need not disclose the computer system records because doing so would impede significantly the performance of judicial functions. This contention stems from our conclusion in *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, supra, 209 Conn. 208, that records that are disclosable, as administrative records, under § 1-200 (1) (A), "must be made available . . . unless doing so would in some manner interfere with the performance of judicial functions." In that case, this court noted that "[w]e have construed the limitation to 'administrative functions' of the public disclosure provisions of the [act] as applied to the judicial department to be designed to accommodate, rather than infringe upon, the independence of a constitutional court in performing its historic functions. . . . To the extent that public access to any of the records ordered by the [commission] to be disclosed may reasonably be considered by the [examining] committee to impede significantly its performance of that [judicial] function, the [examining] committee would be justified in refusing such disclosure." (Citations omitted.) Id., 210–11. This court also noted that the trial court had not made any findings on these essentially factual issues. Id., 211.

This court, therefore, remanded the case to the trial court for further proceedings for this factual inquiry. Id.

This case presents a similar problem. Before the commission, the plaintiffs presented testimony to the effect that, for the period in question, January 2, 2002, through January 29, 2002, there were between 250 and 500 cases entered into the daybook of geographical area number seven. Because there were numerous cases involving the sealing of files, such as pretrial alcohol education, pretrial drug education, pretrial school violence prevention, and youthful offender cases, each paper file would need to be checked against the corresponding records in the continually updated computer system in order to redact duly exempt information before permitting disclosure. This was very time consuming; for example, it took four to five hours to check a mere two days' worth of cases that way. There was also testimony to the effect that, if the clerical staff were required to comply with the commission's order, it would impact negatively their ability to assist the court in its judicial functions by providing, inter alia, courtroom coverage, writing up and disseminating court orders in a timely fashion, preparing files for the court, taking oaths and applications for the diversionary programs, and preparing mittimuses.

The commission, in its decision, attempted to craft an order that would accommodate both the legitimate concerns of the judicial branch about performing its adjudicatory functions and shielding exempt information, and the right of the public to those aspects of the computer system that are legitimately open to it. The commission's decision provided as follows: "Section 1-211 . . . requires a public agency to provide data from a computer system 'if the agency can reasonably make such a copy or have such a copy made.' It is found that new administrative procedures may be required to guarantee the timely entry of new data concerning

exempt records into the [computer system], in order that its records can be available for public inspection at certain periodic intervals to be determined by the . . . [j]udicial [b]ranch. However, it is also found that such new administrative procedures would be reasonable, and therefore that the records requested can 'reasonably' be made available from the [computer system] for at least periodic inspection, as envisioned by § 1-211 . . . . 'Periodic' might combine with the concept of 'reasonably' to mean once a month, at the end of every week, or at the end of every day. The definition of a reasonable period might also change over time as technology improves or based upon budgetary and staffing constraints." In its formal order, the commission referred specifically to this paragraph as follows: "The . . . [j]udicial [b]ranch shall periodically allow [Collins] to inspect the requested records of the [computer system]. The enforcement of this order shall be stayed for ninety days, in order to allow the . . . [j]udicial [b]ranch to implement such procedures as it considers appropriate concerning the periods for public inspection and the timely entry of new data by its staff into [the computer system] . . . . These procedures should be designed to continue the guarantee that exempt information is not disclosed due to error."

The trial court, however, did not make any findings or rulings with respect to this highly fact intensive issue, which, therefore, I believe would require consideration on remand. Therefore, consistent with our approach in *Connecticut Bar Examining Committee*, I would remand the case to the trial court for a further hearing on this issue, including the closely related questions of whether: (1) compliance with the commission's order would impede the adjudicative process; and (2) the judicial branch reasonably could, after establishing new procedures, make available the information sought.[16]

---

[16] It may be that the judicial branch could fashion, reasonably and within appropriate staffing and budgetary restraints, new procedures, including

### III

Finally, the plaintiffs presented, as an alternate ground for affirmance, that even if the records are disclosable as administrative records, they are exempt from disclosure pursuant to § 1-210 (a); see footnote 2 of this dissenting opinion; and General Statutes § 54-142k.[17] I disagree with this contention.

The plaintiffs' contention is as follows. Section 1-210 (a) provides that public records are disclosable "[e]xcept as otherwise provided by any federal law or

---

new computer programs, that would comply with the commission's order while also continuing to shield exempt data. It also may be, however, that ninety days is an insufficient period of time for satisfying the commission's order, or that even with more time, it would be too expensive and too difficult, or take too much "clerkpower" away from the process of adjudication. Alternatively, it may be that some other time period and some other solution, somewhere in between these two extremes, may be more reasonable. I would leave it to the trial court to resolve these issues in the first instance.

[17] General Statutes § 54-142k provides: "(a) Each person or agency holding criminal history record information shall establish reasonable hours and places of inspection of such information.

"(b) Conviction information shall be available to the public for any purpose.

"(c) Any person shall, upon satisfactory proof of his identity, be entitled to inspect, for purposes of verification and correction, any nonconviction information relating to him and upon his request shall be given a computer printout or photocopy of such information for which a reasonable fee may be charged provided that no erased record may be released except as provided in subsection (f) of section 54-142a. Before releasing any exact reproductions of nonconviction information to the subject, the agency holding such information may remove all personal identifying information from it.

"(d) Any person may authorize in writing an agency holding nonconviction information pertaining directly to such person to disclose such information to his attorney-at-law. The holding agency shall permit such attorney to inspect and obtain a copy of such information if both his identity and that of his client are satisfactorily established; provided no erased record may be released unless such attorney attests to his client's intention to challenge the accuracy of such record.

"(e) Any person who obtains criminal history record information other than conviction information by falsely representing to be the subject of the information shall be guilty of a class D felony."

state statute . . . ." The plaintiffs point to § 54-142k as such a statute, arguing that it "requires agencies to make conviction information available to the public, [but that] pending court case information is criminal history record information . . . not conviction information." From this, the plaintiffs argue that Collins "was not entitled to the data pursuant to . . . § 54-142k unless he was the subject of the criminal history record information he was seeking," which he was not because he was neither a defendant nor a defendant's attorney of record.

First, § 54-142k is part of part II of chapter 961a of the General Statutes, which is entitled "Security and Privacy of Criminal Records." That is a comprehensive statutory scheme designed to govern the preservation of criminal history records, and to place appropriate limitations on the disclosure of those records. It is obviously not designed to cover court dockets and the information contained therein. Indeed, if it were, it would mean that, under the plaintiffs' argument, all criminal court dockets of pending cases would not be disclosable under any circumstances—irrespective of the act—to anyone except to the persons involved. That would directly conflict with the constitutional presumption of openness of criminal court records and with the provisions of the rules of practice. See *Hartford Courant Co.* v. *Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004) ("docket sheets enjoy a presumption of openness and . . . the public and the media possess a qualified [f]irst [a]mendment right to inspect them"); cf. *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597–98, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978). Such an interpretation would generate a potentially grave separation of powers issue. This court does not read statutes to do so, particularly the act. See, e.g., *State* v. *Lutters*, 270 Conn. 198, 217, 853 A.2d 434 (2004) ("in choosing between two constructions of a statute, one valid and one constitu-

tionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent" [internal quotation marks omitted]).

I would, therefore, reverse the judgment of the trial court and remand the case for a hearing to determine whether: (1) compliance with the commission's order would impede the adjudicative process; and (2) the judicial branch reasonably could, after establishing new procedures, make available the information sought. Because the majority fails to reach this conclusion, I respectfully dissent.